No. 24-2647

In the

# United States Court of Appeals for the Seventh Circuit

CHONG LEE,

*Petitioner-Appellant,*

v.

BRADLEY MLODZIK,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Wisconsin
No. 2:22-cv-00620-WCG

## BRIEF OF PETITIONER-APPELLANT

Christine A. Walsh
Sydney Darnall
TAFT STETTINIUS &
HOLLISTER LLP
One Indiana Square
Suite 3500
Indianapolis, IN 46204
Tel.: (317) 713-3500
Fax: (317) 713-3699
cwalsh@taftlaw.com
sdarnall@taftlaw.com

Benjamin S. Morrell
TAFT STETTINIUS &
HOLLISTER LLP
111 East Wacker Drive
Suite 2600
Chicago, IL 60601
Tel.: (312) 527-4000
Fax: (312) 527-4011
bmorrell@taftlaw.com

*Appointed Counsel for Petitioner-Appellant*

## DISCLOSURE STATEMENT

The undersigned counsel for Petitioner-Appellant Chong Lee makes the following submissions pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1:

*Represented party's full name.* Chong Lee.

*Law firms that have appeared for the party.* Benjamin S. Morrell, Christine A. Walsh, and Sydney Darnall, of the law firm of Taft Stettinius & Hollister LLP represent Chong Lee in this appeal as appointed counsel under the Criminal Justice Act. He proceeded pro se in the district court. The following attorneys and firms represented Chong Lee in cases in state court related to this appeal:

- Ana L. Babcock of Babcock Law, LLC; and
- Deborah S. Vishny and Evan B. Weitz of the Wisconsin Public Defender's Office.

*Corporate entities.* N/A.

*Organizational victims in criminal cases.* N/A.

*Debtor information.* N/A.

By /s/ *Christine A. Walsh*
   /s/ *Sydney Darnall*
   /s/ *Benjamin S. Morrell*

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2647

Short Caption: Lee v. Mlodzik

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Chong Lee

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Taft Stettinius & Hollister LLP

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Christine A. Walsh    Date: 11/19/2024

Attorney's Printed Name:  Christine A. Walsh

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑  **No** ☐

Address:  One Indiana Square, Suite 3500

    Indianapolis, IN 46204

Phone Number:  317-713-3500    Fax Number:  317-713-3633

E-Mail Address: cwalsh@taftlaw.com

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2647

Short Caption: Lee v. Mlodzik

To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐        **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

Chong Lee

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

Taft Stettinius & Hollister LLP

(3)     If the party, amicus or intervenor is a corporation:

i)        Identify all its parent corporations, if any; and

N/A

ii)       list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ Sydney L. Darnall            Date: 1/22/2025

Attorney's Printed Name:  Sydney L. Darnall

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     **Yes** ☑  **No** ☐

Address:  One Indiana Square, Suite 3500

Indianapolis, IN 46204

Phone Number: 317-713-3500                    Fax Number:  317-713-3699

E-Mail Address: sdarnall@taftlaw.com

rev. 12/19 AK

iv

Save As     Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 24-2647

Short Caption: Lee v. Mlodzik

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

[ ]     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    Chong Lee

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    Taft Stettinius & Hollister LLP

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

       N/A

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

       N/A

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Benjamin S. Morrell     Date: 11/6/2024

Attorney's Printed Name: Benjamin S. Morrell

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** [✔]   **No** [ ]

Address: 111 E. Wacker Dr., Ste. 2600

    Chicago, IL 60601

Phone Number: 312-527-4000     Fax Number: 312-527-4011

E-Mail Address: bmorrell@taftlaw.com

rev. 12/19 AK

# TABLE OF CONTENTS

**Page**

Disclosure Statements ....................................................................ii

Table of Contents ........................................................................vi

Table of Authorities .....................................................................ix

Statement Regarding Oral Argument ..........................................xiii

Statement Regarding Jurisdiction ..................................................1

Questions Presented .....................................................................3

Statement of the Case ...................................................................4

   I.   Officers investigate the death of Joshua Richards inside of the Luna Lounge .......................................................................................4

      A.   Responding officers recorded no witness statements from the scene ...........................................................................4

      B.   After interviewing Ryan Thao, Mikey Thao, and Watou Lee, officers question Paul Lee as a suspect in Joshua Richards' death ............................................................5

      C.   Officers arrest Paul Lee for Joshua Richards' death .............7

      D.   Chong Lee is implicated only after Paul Lee changes his story .....................................................................................8

   II.   In pre-trial proceedings, officers admit to concealing—and then destroying—evidence about the interviews of Ryan Thao, Watou Lee, and Mikey Thao ..............................................................................8

      A.   For nearly 16 months, the State failed to disclose that officers had interviewed three witnesses who saw the shooter .........8

      B.   Sergeant Thao admits to intentionally destroying the 2013 interview recordings and maps of the shooter's location drawn during those interviews .................................................10

C.    Sergeant Thao admits he had a personal relationship with two of the witnesses whose interview recordings and maps he destroyed ......................................................................10

D.    Sergeant Thao admits he destroyed the evidence because he knew Chong's counsel would obtain it in discovery ............12

E.    The prosecutor authorized Sergeant Thao to destroy this evidence ..................................................................................13

F.    Sergeant Thao testifies about *his* memory of the December 2013 interviews ..............................................................14

    1.    Mikey Thao saw the shooter and knew Chong, but he did not identify Chong as the shooter ..........................14

    2.    Ryan Thao saw the shooter and knew of Chong, but he also did not identify Chong as the shooter ................15

    3.    Watou Lee knew Chong but also did not identify him as the shooter ..........................................................15

III.    The trial court finds that the interviews with Mikey Thao, Ryan Thao, and Watou Lee were "potentially exculpatory" and were destroyed in "bad faith" ......................................................15

IV.    The trial court's remedy further prejudiced Chong ....................17

V.    Chong is convicted at trial and exhausts his appeals ................18

VI.    Chong unsuccessfully petitions the district court for habeas relief but obtains a certificate of appealability ................................20

Standard of Review ..................................................................21

Summary of Argument ............................................................23

Argument ................................................................................23

I.    The State violated Chong's Due Process rights under *Youngblood* and *Trombetta* ...............................................................23

A.   The Wisconsin Court of Appeals applied *Youngblood* and *Trombetta* contrary to clearly established law ..................28

B.   Under *Youngblood* and *Trombetta*, Chong is entitled to relief .........................................................................29

    1.   The State intentionally destroyed this evidence in "bad faith." ...............................................................29

    2.   The exculpatory value of the evidence was apparent to the State ..........................................................30

    3.   Chong cannot obtain comparable evidence ...............33

C.   The Wisconsin courts' failure to provide a meaningful remedy was an unreasonable application of *Youngblood* and *Trombetta* .......................................................................35

II.   The State violated Chong's due process rights under *Brady* .......40

A.   The State suppressed the interview recordings and maps ...41

B.   The suppressed evidence was material ...........................42

C.   The suppression of the material evidence prejudiced Chong ...................................................................47

Conclusion ............................................................................49

Certificate of Compliance ........................................................52

Certificate of Service ..............................................................53

Statement that All Required Materials are in Appendices ...................54

Required Short Appendix ..........................................................55

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Arizona v. Youngblood,*
    488 U.S. 51 (1988) .............................................................................. 24

*Armstrong v. Daily,*
    786 F.3d 529 (7th Cir. 2015)..................................................... *passim*

*Bell v. Cone,*
    535 U.S. 685 (2002) ..................................................... 21, 29, 34, 46

*Brady v. Maryland,*
    373 U.S. 83 (1963) .............................................................................. 40

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993) ......................................................................... 49

*Brumfield v. Cain,*
    576 U.S. 305 (2015) ......................................................................... 22

*California v. Trombetta,*
    467 U.S. 479 (1984) .............................................................. *passim*

*Carter v. Buesgen,*
    10 F.4th 715 (7th Cir. 2021) .............................................................. 1

*Giglio v. U.S.,*
    405 U.S. 150 (1972) .............................................................. 41, 42, 49

*Greene v. Fisher,*
    565 U.S. 34 (2011) ........................................................................... 21

*Harris v. Lafler,*
    553 F.3d 1028 ................................................................................... 47

*Henry v. Page,*
   223 F.3d 477 (7th Cir. 2000)............................................................27

*Jones v. McCaughtry,*
   965 F.2d 473 (7th Cir. 1992)....................................................31, 33

*Knowles v. Mirzayance,*
   556 U.S. 111 (2009) ........................................................................22

*Kyles v. Whitley,*
   514 U.S. 419 (1995) ..................................................................*passim*

*Lee v. Mlodzik,*
   2024 WL 4103766 (E.D. Wis. Sept. 6, 2024) ...................................20

*Lee v. Wisconsin,*
   141 S. Ct. 2677 (2021) .....................................................................20

*McCarthy v. Pollard,*
   656 F.3d 478 (7th Cir. 2011)....................................................*passim*

*McNeill v. Bagley,*
   10 F.4th 588 (6th Cir. 2021) ...........................................................44

*Nichols v. Wiersma,*
   108 F.4th 545 (7th Cir. 2024) ..................................................*passim*

*Panetti v. Quarterman,*
   551 U.S. 930 (2007) ........................................................................22

*Pruitt v. Neal,*
   788 F.3d 248 (7th Cir. 2015)...........................................................22

*Smith v. Cain,*
   565 U. S. 73 (2012) ...................................................................42, 47

*State v. Lee,*
   939 N.W.2d 427 (Wis. Ct. App. 2019).......................................19, 20

*State v. Lee,*
    982 N.W.2d 625 (Wis. 2020) ............................................................ 20

*State v. Luedtke,*
    863 N.W.2d 592 (Wis. 2015) ............................................................ 28

*Stern v. Meisner,*
    812 F.3d 606 (7th Cir. 2016) ........................................................... 22

*Strickler v. Greene,*
    527 U.S. 263 (1999) ....................................................................... 40

*U.S. ex rel. Hampton v. Leibach,*
    347 F.3d 219 (7th Cir. 2003) ........................................................... 45

*U.S. v. Agurs,*
    427 U.S. 97 (1976) ................................................................. 40, 46

*U.S. v. Bagley,*
    473 U.S. 667 (1985) ............................................................ *passim*

*U.S. v. Braswell,*
    704 Fed. App'x. 528 (6th Cir. 2017) .................................................. 38

*U.S. v. Chaparro-Alcantara,*
    226 F.3d 616 (7th Cir. 2000) ........................................................... 30

*U.S. v. Garcia,*
    596 Fed. App'x. 24 (2d Cir. 2015) .................................................... 39

*U.S. v. Hannah,*
    2021 WL 3173571 (C.D. Ill. July 27, 2021) ...................................... 38

*U.S. v. Laurent,*
    607 F.3d 895 (1st Cir. 2010) ........................................................... 39

*U.S. v. Romo-Chavez,*
    681 F.3d 955 (9th Cir. 2012)...............................................................38

*U.S. v. Sivilla,*
    714 F.3d 1168 (9th Cir. 2013).............................................................39

*U.S. v. Wise,*
    221 F.3d 140 (5th Cir. 2000)...............................................................38

*United States v. Grintjes,*
    237 F.3d 876 (7th Cir. 2001).........................................................41, 48

*Wainwright v. Goode,*
    464 U.S. 78 (1983) ...............................................................................30

*Wearry v. Cain,*
    577 U.S. 385 (2016) .............................................................................42

*White v. Woodall,*
    572 U.S. 415 (2014) .............................................................................22

## Statutes

28 U.S.C.
    § 1291...................................................................................................1
    § 2241...................................................................................................1
    § 2253...................................................................................................x
    § 2254..........................................................................................*passim*

## Federal Rules

Fed. R. App. P.
    Rule 34 .................................................................................................x

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner-Appellant Chong Lee (referred to in this brief as Chong to distinguish him from a brother named Paul) requests oral argument. When the district court granted a certificate of appealability, it found that Chong "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Additionally, this case presents important questions regarding the proper application of Supreme Court precedent, in the context of the State's admission that Chong's due process rights were violated. For these reasons, Chong respectfully submits that the Court's decisional process would be significantly aided by oral argument in this case. *See* Fed. R. App. P. 34(a)(1).

## STATEMENT REGARDING JURISDICTION

*District court's jurisdiction*. The district court had jurisdiction over Chong's habeas petition under 28 U.S.C. §§ 2241–2254. First, he is "in custody pursuant to the judgment of a State court" and asserts "that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see generally* Short App. 1–16. Second, the Waupun Correctional Institution has had Chong "in custody" from the time he filed his petition through today, and is located in the Eastern District of Wisconsin. *See* 28 U.S.C. § 2241(d).

*Appellate jurisdiction*. This Court has jurisdiction over an appeal from a district court's final decision, 28 U.S.C. § 1291, including a denial of a habeas petition brought under 28 U.S.C. § 2254, *see Carter v. Buesgen*, 10 F.4th 715, 720 (7th Cir. 2021). The district court denied in full Chong's § 2254 petition and disposed of all of his claims in its order. A "final judgment" accompanied the order. The district court also issued a certificate of appealability, Short App. 16, and the constitutional issue identified by the district court is whether the State violated [Chong's] due process rights when government officials first failed to disclose, and then later intentionally destroyed, recordings of three preliminary interviews

with witnesses," Dkt. 3, at 1. This Court has jurisdiction over this appeal.

*Timeliness of appeal*. The district court entered judgment on September 6, 2024. Dkt. 45. Chong timely filed his notice of appeal 14 days later. Dkt. 46.

# QUESTIONS PRESENTED

1.     The Fourteenth Amendment guarantees a criminal defendant's right to the preservation of potentially exculpatory evidence. Here, the state court concluded that law enforcement officers intentionally destroyed "potentially exculpatory evidence" in "bad faith." Although required to provide Chong a remedy that afforded him "a meaningful opportunity to present a complete defense," the state court's remedy further prejudiced him. Did the Wisconsin Court of Appeals unreasonably apply clearly established federal law in finding this remedy sufficient?

2.     The State's suppression of evidence favorable to a criminal defendant violates the Fourteenth Amendment if the evidence is material to guilt. Here, the State admitted to suppressing evidence of three eyewitnesses to the shooting who knew or knew of Chong but did not identify him as the shooter. Instead, these eyewitnesses' interviews led the State to immediately arrest a *different* suspect. Did the Wisconsin Court of Appeals unreasonably apply clearly established federal law in finding this evidence was not material and Chong was not prejudiced by its suppression?

## STATEMENT OF THE CASE

### I.   Officers investigate the death of Joshua Richards inside of the Luna Lounge.

At around 1:50 a.m. on December 8, 2013, someone killed Joshua Richards inside a nightclub called the Luna Lounge in Appleton, Wisconsin. Additional App. 2. Richards was "fatally shot in the head" from a "close range"—somewhere between "mere contact out to a few inches." Dkt. 26-20, at 42. Moments before the shooting, Richards was in a physical altercation with Paul Lee. Dkt. 26-19, at 134. Paul Lee is Chong Lee's brother. *Id.* at 145. Paul, along with Joe Thor and Phong Lee (no relation), were captured on security-camera footage running out of the Luna Lounge at around 1:50 a.m. Dkt. 26-18, at 85–87. The footage depicts the trio running northeast toward a nearby dumpster, where Phong Lee discarded the white vest he was wearing. *Id.*; Dkt. 26-19, at 186–88. Moments later, Chong appears in the footage leaving through the same Luna Lounge exit with a different group of people. Dkt. 26-25, at 143–44.

### A.   Responding officers recorded no witness statements from the scene.

After the shooting, officers with the Appleton Police Department interviewed approximately 150 people who were at the Luna Lounge when Richards was shot. Dkt. 26-12, at 66. None of these interview

4

recordings, notes, and reports were retained by the responding officers. *Id.* The responding officers recorded no description of the shooter. However, a Luna Lounge security guard did tell officers there were "two Asian individuals that had left the scene" after the shooting, and that one of the individuals was dressed in a "white hat with a straight brim . . . white vest, gray undershirt." Dkt. 26-18, at 70, 119–120. The responding officers recovered from the dumpster a white vest and a baseball cap with a short brim. Dkt. 26-18, at 87; Dkt. 26-19, at 187. Paul Lee, Joe Thor, and Phong Lee are all Asian. Dkt. 26-20, at 21–22. Security and traffic-camera footage showed many other Asians at the Luna Lounge around the time Richards was shot, including Chong, Ryan Thao, Mikey Thao, Jack Thao, and Watou Lee. Additional App. 2–3; Dkt. 26-15, at 28. Mikey Thao, Watou Lee, and Jack Thao separately fled the scene by car and were stopped shortly afterwards in a routine traffic stop. Dkt. 26-15, at 28–29.

**B.  After interviewing Ryan Thao, Mikey Thao, and Watou Lee, officers question Paul Lee as a suspect in Joshua Richards' death.**

Three days after the shooting, Sergeants Chue Lee Thao (no relation) and Cary Meyer interviewed Ryan Thao at his workplace. Dkt. 26-

12, at 31, 46, 52. The same day, Sergeant Thao interviewed Watou Lee in Sergeant Thao's office at the Appleton Police Station. Dkt. 26-15, at 30; Dkt. 26-12, at 49. Later that evening, Sergeant Thao interviewed Mikey Thao alone.

That evening, after completing Ryan and Watou's interviews, Sergeant Thao and Sergeant Neal Rabas then questioned Paul Lee outside his workplace. At that point, both officers suspected that Paul shot Richards. Dkt. 26-14, at 81–82; Dkt. 26-21, at 35. Sergeant Rabas told Paul that five different people had identified him as the shooter and told the Appleton Police that he had shot Richards in the side of the head. *Id.* Paul responded that he "didn't know about the shooting personally but [he] had heard about it on the news." *Id.* at 22. As the interview progressed, Paul eventually admitted to being at the Luna Lounge on the night of the shooting but said he "had left Luna and . . . had [walked] home alone." *Id.* at 20, 24. Sergeants Thao and Rabas also questioned Paul about other Luna Lounge attendees, particularly whether Mikey Thao could have been the shooter. Dkt. 26-14, at 42.

Paul finally admitted that he was still at the Luna Lounge when the shooting occurred—but only after the Sergeants informed him that

6

they knew he fled with Joe Thor and Phong Lee immediately after the gunshot, ditched their clothes in a dumpster, and fled to Joe Thor's house. Dkt. 26-21, at 25, 27, 29. Even then, Paul denied fighting with Richards. *Id.* at 22. But then that story changed, too. *Id.* Paul eventually claimed he had been hit on the back of his head and admitted he punched Joshua Richards in the chin. Dkt. 26-21, at 36, 71. But Paul still denied any involvement in the shooting. *Id.*

## C. Officers arrest Paul Lee for Joshua Richards' death.

Based on the information they had gathered—including their interviews of Ryan Thao, Watou Lee, and Mikey Thao earlier that day, Sergeants Thao and Rabas arrested Paul Lee for Richards' murder at the conclusion of his interview. Dkt. 26-24, at 219–220.

Early the next morning, Sergeants Thao and John Schira began interrogating Paul "off and on until [he was] released at 1:00." Dkt. 26-21, at 48. That in-custody interrogation was recorded on video. *Id.* at 47. The footage depicts Paul again changing his story—this time claiming that his brother Chong shot Richards. *Id.* at 51, 56. According to this version of Paul's story, Chong admitted to shooting Richards while at Joe Thor's house after the shooting. *Id.* at 51. After memorializing Paul's new

7

statement in writing, the Appleton Police Department released Paul from custody and Sergeant Thao drove Paul home. *Id.* at 57.

### D. Chong Lee is implicated only *after* Paul Lee changes his story.

Later that same day, a team of Appleton Police Department officers arrested Chong for Richards' murder. Dkt. 26-25, at 184–85; Dkt. 26-21, at 123. Three days later, Wisconsin prosecutors charged Chong with, among other things, first-degree intentional homicide in Outagamie County Circuit Court. Additional App. 4.

## II. In pre-trial proceedings, officers admit to concealing—and then destroying—evidence about the interviews of Ryan Thao, Watou Lee, and Mikey Thao.

### A. For nearly 16 months, the State failed to disclose that officers had interviewed three witnesses who saw the shooter.

Chong only learned that Ryan Thao, Mikey Thao, and Watou Lee were potential witnesses regarding the shooting nearly 16 months after his arrest. Dkt. 26-12, at 26. Even then, he learned about these witnesses only after Sergeant Rabas inadvertently shared a photo with defense counsel in April 2015. Dkt. 26-12, at 63. This photo captured the Appleton Police Department's investigatory whiteboard from December 2013—a board displaying photos and full names of potential sources and

witnesses, including Ryan Thao, Mikey Thao, and Watou Lee. *Id.* at 56, 63–64.

Chong now knew that Ryan, Mikey, and Watou were potential witnesses. *Id.* at 26. But the State still did not disclose that Sergeant Thao interviewed all three of them the very same day they decided to arrest Paul for Joshua Richards' death. Dkt. 26-14, at 46. Instead of disclosing that fact to Chong's counsel, Sergeants Thao and Rabas reached out to Ryan, Mikey, and Watou with an apparent plan to protect the witnesses from further questioning:

> It's possible that the defense counsel or their investigator may want to talk to you, and, sort of, would you be willing to give a statement – because you were inadvertently identified, would you be willing to give us a statement today in reference to what you saw or witnessed. That way, if the defense would like to question you, then you've already given a statement to the police.

Dkt. 26-12, at 61–62. Sergeants Thao Rabas persuaded the witnesses to give *new* statements about what they saw or witnessed the night of the shooting, in interviews conducted on April 17 and 18, 2015. *Id.* at 74. After completing the new interviews, the State turned over the recordings of the new interviews to defense counsel; the State still did not disclose the existence of the 2013 interviews. *Id.* at 27. When Chong's

counsel listened to these new interview recordings, it became apparent that Sergeant Thao had previously interviewed Ryan Thao, Mikey Thao, and Watou Lee.

**B.    Sergeant Thao admits to intentionally destroying the 2013 interview recordings and maps of the shooter's location drawn during those interviews.**

Having never learned of the existence of—much less received—the notes or recordings from those earlier interviews, Chong moved to compel the State to produce "all reports, notes, and recordings of the initial interviews" of Ryan Thao, Mikey Thao, and Watou Lee. Dkt. 26-12, at 26. At the hearing on that motion, Chong's counsel called Sergeant Thao as a witness, where he testified that he intentionally destroyed the December 2013 recordings of his interviews with Ryan Thao, Mikey Thao, and Watou Lee. *Id.* at 31–32. Sergeant Thao also testified that he destroyed maps that Ryan Thao, Mikey Thao, and Watou Lee drew to depict where the shooter came from inside the Luna Lounge—maps they had drawn during their December 2013 interviews. Dkt. 26-15, at 43.

**C.    Sergeant Thao admits he had a personal relationship with two of the witnesses whose interview recordings and maps he destroyed.**

At the hearing, Sergeant Thao also admitted under questioning by Chong's counsel that he had personal relationships with Mikey Thao and

Ryan Thao:

> Q    Are you related to Mikey Thao?
>
> A    Describe in terms of relationship because there is differ-
>      ent types of relationship in terms of Hmong culture.
>
> Q    All right. In Hmong culture please describe how you are
>      related to Mikey Thao.
>
> A    I'm not blood related to him. In terms of relationship in
>      terms of in the community, I know him, I know his par-
>      ents, they go to my church.
>
> Q    You're in the same clan?
>
> A    Same last name, yes.
>
> Q    All right. What about Ryan Thao, are you related to
>      Ryan Thao?
>
> A    Not by blood.
>
> Q    How are you related in Hmong culture to him?
>
> A    Same last name, we go to – his parents attend the same
>      church that I attend, and we've been, at least, you know,
>      from Thailand to Laos – I mean from Thailand to United
>      States and into Wisconsin obviously have been living in
>      the same area.

Dkt. 26-12, at 42. Despite these personal relationships, Sergeant Thao

chose to interview Ryan Thao and Mikey Thao, and chose to interview

Mikey alone with no other officers present. Dkt. 26-12, at 49. Sergeant

Thao also admitted that prior to their interviews, he did not read the

11

report from Mikey Thao and Watou Lee's traffic stop after they fled the

Luna Lounge. Dkt. 26-12, at 31.

> **D.** **Sergeant Thao admits he destroyed the evidence because he knew Chong's counsel would obtain it in discovery.**

Sergeant Thao justified his destruction of the interview recordings

and maps because Ryan Thao, Mikey Thao, and Watou Lee were "very

concerned about their safety and they did not want to be identified." *Id.*

at 44. Sergeant Rabas explained the thought process further, stating that

they specifically destroyed the recordings because they know Chong's de-

fense "would be able to obtain that" through discovery:

> I think [the decision to destroy the evidence] was made with the investigators that were working on the case as to what do we do with this information . . . we believe that if there were any of those recordings, photographs, or any submissions like that, we knew through discovery the defense would be able to obtain that, so I think as an investigative team we just de-cided that nothing would be retained.

*Id.* at 65. Sergeant Thao also testified about other irregularities plaguing

his interviews of Ryan Thao, Mikey Thao, and Watou Lee. While he rec-

orded their interviews with a digital recorder in accordance with the Ap-

pleton Police Department's policy, Sergeant Thao never wrote corre-

sponding reports or transcribed the interviews. *Id.* at 33, 44, 49. Sergeant

Thao also "maintained possession" of the audio recordings by uploading them into a personal working file, never uploading the recordings into an evidence file. *Id.* at 49. He claims he did that because the witnesses wanted to remain anonymous, but both steps violated departmental policy. Dkt. 26-12, at 44–45; Dkt. 26-14, at 23–25.

### E. The prosecutor authorized Sergeant Thao to destroy this evidence.

The District Attorney's Office authorized the Appleton Police Department to destroy the recordings without ever disclosing them to Chong. Dkt. 26-12, at 34. Sergeant Thao testified that the District Attorney's Office knew Ryan Thao, Mikey Thao, and Watou Lee did not want to be identified as witnesses by February 2014 and that prosecutors told him the interview recordings were "not going to be needed and so . . . [Sergeant Thao] could destroy them." *Id.* Sergeant Thao destroyed the recordings from his personal drive around seven to eight months after the interviews, *i.e.*, July or August 2014. *Id.* at 32, 35, 37. Sergeant Thao testified that he destroyed the recording of Ryan Thao's interview because "he did not want to be identified" and because "at that time I did not know whether or not he was going to be willing to be a witness." *Id.* at 33. Sergeant Thao continued: "so it was a decision that was made

that—to destroy it because of his request and no report was done so I came to the conclusion, consultations as well, that it did not need to be logged into evidence or saved." *Id.* Although he says he consulted with others, he later confirmed that those consultations were only with fellow members of the Appleton Police Department. *Id.* at 34.

**F.  Sergeant Thao testifies about *his* memory of the December 2013 interviews.**

Without any other means to gather this information, Chong's counsel questioned Sergeant Thao during the motion to compel hearings about what each witness supposedly said in their December 2013 interviews. *See generally* Dkt. 26-12; Dkt. 26-14; Dkt. 26-15.

**1.  Mikey Thao saw the shooter and knew Chong, but he did not identify Chong as the shooter.**

According to Sergeant Thao, Mikey Thao knew Chong from growing up in the community together and going to the same school. Dkt. 26-14, at 99. Mikey also grew up with Chong's brother, Paul. *Id.* Mikey was close to the shooting inside the Luna Lounge, and said he saw the shooter come from the left of the bar. Dkt. 26-12, at 37–38. Mikey did not identify Chong as the shooter, even though he was asked about Chong. *Id.* Mikey stated that he did not think Chong was even in the bar that night, and thought Chong may have been in jail. *Id.* at 39.

### 2. Ryan Thao saw the shooter and knew of Chong, but also did not identify Chong as the shooter.

According to Sergeant Thao, Ryan Thao was aware of Chong's family and brothers, too. Dkt. 26-15, at 20. Ryan described the shooter as coming from the bar into the foyer area with a couple other people. Dkt. 26-12, at 51–52. Sergeant Thao could not recall Ryan's description of the shooter's clothing. *Id.* And, like Mikey, Ryan never identified Chong as the shooter. Dkt. 26-15, at 35.

### 3. Watou Lee knew Chong but also did not identify him as the shooter.

According to Sergeant Thao, Watou Lee knew Chong and Paul "through [Watou's] socialization with Mikey Thao and with Ryan Thao and the fact that [Watou is] aware of the gang or the association with friends in that group." Dkt. 26-15, at 40. Watou provided "the description of the direction of travel" of the shooter. *Id.* at 42. Like Mikey and Ryan, Watou did not identify Chong as the shooter. *Id.* at 38.

## III. The trial court finds that the interviews with Mikey Thao, Ryan Thao, and Watou Lee were "potentially exculpatory" and were destroyed in "bad faith."

On September 29, 2015, Chong moved to dismiss the first-degree intentional homicide charge, arguing that the State violated his right to due process by failing to disclose—then destroying—the recordings of the

December 2013 interviews of Ryan Thao, Mikey Thao, and Watou Lee. In the alternative, Chong moved for suppression of "any in court identification of Chong" by the three witnesses and any testimony by those witnesses that linked Chong to the homicide in this case. Additional App. 21, n.12.

The trial court held that Sergeant Thao's December 2013 interviews of Ryan Thao, Mikey Thao, and Watou Lee were "potentially exculpatory" and were destroyed in "bad faith." Additional App. 29–31. The court further found that these actions were "inconsistent with" the spirit of interview retention policies maintained by the Appleton Police Department":

> [T]here is a sufficient indicia to suggest that bad faith as defined here was present. First of all we look at the nature of the evidence. Now, the court concludes that the police were aware of the nature of the evidence. The court reaches this conclusion based upon the following: Number one, the court (sic) felt it appropriate to initially interview the three individuals as potential witnesses; number two, the recordings of those individuals were maintained for many months before destruction; number three, even after the destruction of evidence, the images and names of the three remained on the white board, a board which the court understands is used to track the investigation. There, the inclusion on the board, begets the question, if not potentially exculpatory, why remain on the white board. Once the three were disclosed to opposing counsel, those three individuals were reinterviewed, thus bringing to question why reinterview if not potentially

16

exculpatory. Next, at some point the police made an effort to notify the DA of the destruction of the evidence. With respect to the decision to eliminate the records, the court notes that the *Luedtke* case does not mandate that the suppression be of actual exculpatory evidence. As such, the court concludes that this element also allows for the consideration of potentially exculpatory evidence.

***

[B]ased upon this court's review of policies pertaining to the retention of interviews, the destruction, while perhaps not in violation of a direct policy, was certainly an unusual practice and inconsistent with the spirit of interview retention policies maintained by the Appleton Police Department.

*Id.* at 11–12.

## IV. The trial court's remedy further prejudiced Chong.

Nonetheless, the trial court denied Chong's motion to dismiss the first-degree intentional homicide charge because of the State's violation of his constitutional rights. In the alternative, Chong had requested relief from "any in court identification" of him by Mikey Thao, Ryan Thao, and Watou Lee, or any testimony from them linking Chong to the shooting. Additional App. 21, n.12. Such requests were consistent with Sergeant Thao's testimony of what these three witnesses saw—they all were eyewitnesses to the shooting, but none of them identified Chong as the shooter even when the police explicitly asked about him. Thus, if Chong received this alternative relief, these three witnesses could testify but not

17

change their stories and identify Chong as the shooter, since he did not have access to the destroyed evidence to impeach such testimony.

Instead, the trial court prohibited the State from calling these three witnesses at trial and ruled that if Chong decided to call these three witnesses or question the officers about their destruction of evidence, the that would reopen the door for further questioning of the witnesses by the State or further explanation from the officers. Additional App. 34–36. This prevented Chong from introducing exculpatory evidence—that the three witnessed the shooting and did not identify Chong as the shooter during their 2013 interviews when the police asked who the shooter was, but did say something leading to the immediate focus on Paul Lee—without running the risk of Mikey Thao, Ryan Thao, or Watou Lee changing their stories on the witness stand. If they did so, Chong would have no way to impeach them because the police destroyed that evidence.

## V.     Chong is convicted at trial and exhausts his appeals.

At Chong's trial, the State called seven individuals who claimed Chong confessed to being the shooter at the Luna Lounge. Additional App. 13–14. None of these witnesses testified that they actually saw Chong shoot Richards. *Id.* Five of the witnesses—Via Xai Thao, Peter

Moua, Kong Vang, Melanie Thao, and Stephanie Thao—were not present at the Luna Lounge during the shooting. *See generally* Dkt. 26-19, at 27–47, 54–77; Dkt. 26-21, at 130–237. Two of witnesses—Joe Thor and Phong Lee—were present at the Luna Lounge and in close proximity of the shooting. Dkt. 26-23, at 17; Dkt. 26-19, at 135.

A jury convicted Chong of, among other things, first-degree intentional homicide following an 11-day jury trial. Dkt. 26-28, at 3–5. The jury never learned about the destroyed witness interviews and never heard from Ryan Thao, Mikey Thao, or Watou Lee. *See generally* Dkt. 26-17; Dkt. 26-18; Dkt. 26-19; Dkt. 26-20; Dkt. 26-21; Dkt. 26-22; Dkt. 26-23; Dkt. 26-24; Dkt. 26-25; Dkt. 26-26; Dkt. 26-27. Paul Lee testified that he accused Chong of being the shooter during his in-custody interview because that was "what [Sergeant] Thao wanted [him] to write." Dkt. 26-21, at 54. Sergeant Thao testified for the State but did not discuss the destroyed witness interviews. *See generally* Dkt. 26-25; Dkt. 26-26.

Chong pursued a direct appeal and then postconviction relief in state court, but the Wisconsin Court of Appeals affirmed both his conviction and the denial of his motion for postconviction relief in the same opinion. *State v. Lee*, 939 N.W.2d 427 (Wis. Ct. App. 2019) (per curiam).

The State conceded that the police suppressed the December 2013 interviews, but the court held that Chong failed to show that the destroyed interviews were favorable to him or material to the determination of his guilt. *Id.* The Wisconsin Supreme Court denied Chong's petition for review of his direct appeal, *State v. Lee*, 982 N.W.2d 625 (Wis. 2020), and the United States Supreme Court denied his petition for a writ of certiorari, *Lee v. Wisconsin*, 141 S. Ct. 2677 (2021). *See* Dkt. 26-7; Dkt. 26-8; Dkt. 26-9; Dkt. 26-10; Dkt. 26-11.

## VI.  Chong unsuccessfully petitions the district court for habeas relief but obtains a certificate of appealability.

Chong then filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Wisconsin. *See generally* Dkt. 1. The district court ultimately denied the petition, reasoning that the destroyed December 2013 witness interviews were not exculpatory and that Chong could not point to an unreasonable application of clearly established federal law or lack of support by the evidence, as required under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lee v. Mlodzik*, No. 22-C-620, 2024 WL 4103766, at *8 (E.D. Wis. Sept. 6, 2024); *see* Short App. 1–17. However, the district court issued a certificate of appealability "as to the issue

20

of whether the destruction of evidence violated Chong Lee's right to due process." *Id.* Chong timely filed this appeal.

## STANDARD OF REVIEW

A federal court's collateral review of a state-court conviction focuses on the "last state-court adjudication on the merits of" the petitioner's claims. *Greene v. Fisher*, 565 U.S. 34, 40 (2011). If the state court adjudicated a claim on the merits, AEDPA restricts habeas relief to cases in which the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A federal court may issue a writ of habeas corpus under the "contrary to" clause "if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than [the Supreme Court has] on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal court may grant relief under the "unreasonable application" clause "if the state court correctly identifies the governing legal principle from [Supreme

Court] decisions but unreasonably applies it to the facts of the particular case." *Id.* "This is not to say that § 2254(d)(1) requires an 'identical factual pattern before a legal rule must be applied.'" *White v. Woodall*, 572 U.S. 415, 427 (2014) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007)). "To the contrary, state courts must reasonably apply the rules 'squarely established' by this Court's holdings to the facts of each case." *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)).

Here, the last state court decision to rule on the merits of the Mr. Lee's claims is the Wisconsin Court of Appeals' opinion affirming his conviction and the denial of postconviction relief. Whether that decision ran afoul of AEDPA standards is a legal determination that the Court reviews de novo. *Pruitt v. Neal*, 788 F.3d 248, 264 (7th Cir. 2015). "When reviewing a district court's ruling on a habeas corpus petition," this Court also reviews "the district court's factual findings for clear error and rulings on issues of law *de novo.*" *Stern v. Meisner*, 812 F.3d 606, 609 (7th Cir. 2016). A state court's factual findings receive deference if "[r]easonable minds reviewing the record might disagree about the finding in question." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015).

## SUMMARY OF THE ARGUMENT

Chong is entitled to relief under 28 U.S.C. § 2254(d). First, the Wisconsin Court of Appeals applied *Youngblood* and *Trombetta* contrary to clearly established federal law. Second, Chong is entitled to relief under *Youngblood* and *Trombetta* but the "remedy" provided by the trial court—and affirmed by the Wisconsin Court of Appeals—*further* prejudiced Chong. He is thus entitled to dismissal because it is impossible for him to receive due process of law. Even if the Court concludes the prejudice to Chong could be cured, the remedy fashioned by the state court did not do so. Because the state court failed to provide Chong a remedy affording him a meaningful opportunity to present a complete defense, he is entitled to relief under *Youngblood* and *Trombetta.* Finally, Chong is entitled to relief because the Wisconsin Court of Appeals unreasonably applied *Brady* to the facts of this case. The court's contrary decision was not merely wrong; it was objectively unreasonable. It should therefore be set aside even under AEDPA's deferential standard.

## ARGUMENT

### I.   The State violated Chong's due process rights under *Youngblood* and *Trombetta.*

"The general principles regarding the prosecution's duty to preserve

exculpatory evidence are well-established." *Nichols v. Wiersma*, 108 F.4th 545, 554 (7th Cir. 2024), *cert. denied*, No. 24-563, 2025 WL 76493 (Jan. 13, 2025). "Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness." *McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)). "This standard of fairness requires that defendants be afforded a meaningful opportunity to present a complete defense." *Id.* (citing *Trombetta*, 467 U.S. at 485). "To safeguard this right, the Supreme Court developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *Id.* (quoting *Trombetta*, 467 U.S. at 485). "Taken together, 'this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.'" *Id.* (quoting *Trombetta*, 467 U.S. at 483–84).

"The Supreme Court's decisions in *Trombetta* and *Youngblood* govern a state's duty under the Due Process Clause of the Fourteenth Amendment to preserve evidence on behalf of a defendant." *Id.* at 484 (citing *Trombetta*, 467 U.S. at 480, 488–89; *Arizona v. Youngblood*, 488

24

U.S. 51, 58 (1988)). "The prosecution's duty is to 'preserve potentially exculpatory evidence on behalf of defendants.'" *Nichols*, 108 F.4th at 554 (quoting *Trombetta*, 467 U.S. at 481). This duty extends to impeachment evidence as well. *Id.*

In *Trombetta*, the Supreme Court considered whether prosecutors must preserve breath samples used in conjunction with an Intoxilyzer test. 467 U.S. at 488–89. The Court determined the State had no such duty because: (1) the officers were acting in "good faith and in accord with their normal practice"; (2) the evidence did not "possess an exculpatory value that was apparent before the evidence was destroyed"; and (3) the evidence was not "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 487–89.

Four years later, in *Youngblood*, the Supreme Court "addressed whether a state was required to preserve semen samples that might have been useful to a criminal defendant." *McCarthy*, 656 F.3d at 484 (citing 488 U.S. at 337). The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process." *Youngblood*,

488 U.S. at 58. The Supreme Court explained the rationale behind this bad faith requirement: "Whenever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Youngblood*, 488 U.S. at 69 n. 6 (quoting *Trombetta*, 467 U.S. at 486).

This Court has previously explained that its "interpretation of *Trombetta* and *Youngblood* differs from that of Wisconsin courts." *McCarthy*, 656 F.3d at 484; *see also Nichols*, 108 F.4th at 554. "According to Wisconsin courts, these cases stand for the proposition that a defendant's due process rights are violated if the police (1) failed to preserve 'apparently' exculpatory evidence, leaving the defendant with no ability to obtain comparable evidence by any other reasonable means (with this portion of the rule deriving from *Trombetta*); or (2) failed to preserve 'potentially' exculpatory evidence in bad faith (with this portion of the rule deriving from *Youngblood* )." *McCarthy*, 656 F.3d at 484. However, according to this Court's precedent, "*Trombetta* and *Youngblood* do not create two separate rules, with the former governing 'apparently' exculpatory evidence and the latter governing 'potentially' exculpatory evidence." *Id.* at 484–85. The Court instead reads "both cases to stand for the same

proposition: the destruction of potentially exculpatory evidence violates a defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *Id.* at 485 (citing *Henry v. Page*, 223 F.3d 477, 481 (7th Cir. 2000) (explaining that *Youngblood* used the word "potentially" to illustrate that the defendant failed the second prong of *Trombetta*'s test—that the evidence's exculpatory value is apparent)).

Although concluding Chong was entitled to relief under the Wisconsin Supreme Court's interpretation of *Youngblood* and *Trombetta*, the Wisconsin Court of Appeals applied *Youngblood* and *Trombetta* contrary to clearly established federal law. Chong is entitled to relief under *Youngblood* and *Trombetta*. But the "remedy" provided by the trial court—and affirmed by the Wisconsin Court of Appeals—*further* prejudiced Chong. He is thus entitled to dismissal because it is "*impossible* for the accused to receive due process of law." *Armstrong v. Daily*, 786 F.3d 529, 552 (7th Cir. 2015). Even if the Court concludes this prejudice could be cured, the remedy fashioned by the state court did not do so. Because

27

the state court failed to provide Chong a remedy affording him "a meaningful opportunity to present a complete defense," he is entitled to relief under *Youngblood* and *Trombetta*. *McCarthy*, 656 F.3d at 483.

### A. The Wisconsin Court of Appeals applied *Youngblood* and *Trombetta* contrary to clearly established law.

The Wisconsin Court of Appeals concluded that Chong was entitled to relief under Wisconsin Supreme Court's interpretation of *Youngblood* and *Trombetta*, that is, "a defendant's due process rights regarding the destruction of evidence are violated if the State (1) fails to preserve evidence that is apparently exculpatory or (2) acts in bad faith by failing to preserve evidence that is potentially exculpatory." Additional App. 16 (quoting *State v. Luedtke*, 863 N.W.2d 592 (Wis. 2015)). In this case, the State has previously conceded that the Wisconsin Supreme Court's test is "based on a misinterpretation of the relevant [United States] Supreme Court precedent." Additional App. 16, n.8. The Wisconsin Court of Appeals nevertheless held that it was bound by the test set forth by the Wisconsin Supreme Court. *Id.*

This Court has yet to decide whether "AEDPA requires us to accept as correct Wisconsin's interpretation of *Trombetta* and *Youngblood*," though it has repeatedly characterized this proposition as "dubious."

28

*Nichols*, 108 F.4th at 554 (quoting *McCarthy*, 656 F.3d at 485). But Wisconsin's test, as applied here by the Wisconsin Court of Appeals, is contrary to clearly established law. 28 U.S.C. § 2254(d)(1). The Wisconsin Court of Appeals applied "a rule different from the governing law set forth in [Supreme Court] cases," specifically *Trombetta* and *Youngblood*. *Bell*, 535 U.S. at 694. Because Chong satisfies all the elements of *Trombetta* and *Youngblood* under clearly established federal law, this Court may grant him relief.

## B.  Under *Youngblood* and *Trombetta*, Chong is entitled to relief.

Under *Youngblood* and *Trombetta*, "the destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *McCarthy*, 656 F.3d at 485. This is the rare case where a defendant can satisfy all three elements of *Youngblood* and *Trombetta*.

### 1.  The State intentionally destroyed this evidence in "bad faith."

Both the trial court and the Wisconsin Court of Appeals found that

the State intentionally destroyed the interview recordings in "bad faith" and with some "forethought" because "they knew the defense would be able to obtain them through discovery." Additional App. 17–18. "Federal habeas courts presume that state courts reasonably found the facts, and this rule 'applies equally to findings of trial courts and appellate courts.'" *Nichols*, 108 F.4th at 556 (quoting *Wainwright v. Goode*, 464 U.S. 78, 85 (1983)). This finding of bad faith is reasonable and well-supported, entitling it to deference. *Id.* All these findings are supported by the testimony of Sergeant Thao, who personally destroyed the interview recordings. Dkt. 26-12, at 30–48; Dkt. 26-14, at 84–111; Dkt. 26-15, at 15–43; Dkt. 26-25, at 251; Dkt. 26-26, at 2–108.

### 2. The exculpatory value of the evidence was apparent to the State.

"The Supreme Court in *Youngblood* said that '[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.'" *U.S. v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000) (quoting *Youngblood*, 488 U.S. at 56 n.*). This Court acknowledged that standard in *Jones v. McCaughtry*, "adding that the defendant must prove 'official animus' or

a 'conscious effort to suppress exculpatory evidence.'" *Id.* (quoting *Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992)). Here, the trial court "conclude[d] that the police were aware of the nature of the evidence." Additional App. 29–31. The trial court reached this conclusion for the following reasons. First, the State "felt it appropriate to initially interview the three individuals as potential witnesses." *Id.* at 11. Second, "the recordings of those individuals were maintained for many months before destruction." *Id.* Third, "even after the destruction of evidence, the images and names of the three remained on the white board, a board which the court understands is used to track the investigation." *Id.* This inclusion on the whiteboard "begets the question, if not potentially exculpatory, why remain on the white board." *Id.* "Once the three were disclosed to opposing counsel, those three individuals were reinterviewed, thus bringing to question why reinterview if not potentially exculpatory." *Id.* The trial court thus reasonably concluded that the exculpatory value of the evidence was apparent to the State before it destroyed the evidence. *See Nichols*, 108 F.4th at 556 (explaining that under AEDPA, reviewing courts "presume that state courts reasonably found the facts"). Indeed, this evidence led to the immediate arrest of a *different* suspect—Paul Lee.

The officers understood this evidence could be exculpatory to Chong; they destroyed the evidence "because they knew the defense would be able to obtain them through discovery." Dkt. 26-12, at 65.

Sergeant Thao's testimony about what the witnesses said further supports the state court's conclusion that the exculpatory value was evident to prosecutors. First, Mikey Thao *knew* Chong and his family. Dkt. 26-14, at 99. Mikey went to school with Chong. He grew up in the same community that Chong grew up in. *Id*. Despite claiming to have seen the shooter—and despite Sergeant Thao having expressly asked Mikey about Chong—Mikey did *not* identify Chong as the shooter. *Id*. at 99–100. Ryan Thao also knew of Chong and his family. Dkt. 26-15, at 20, 37. Watou Lee knew about Chong's family through his friendship with Mikey Thao and Ryan Thao. Dkt. 26-15, at 40. Despite also seeing the shooter come from the foyer, neither Ryan nor Watou identified Chong either. *Id*. at 36–38. This information comes *directly* from the officer who took the interviews and then destroyed the recordings. The exculpatory value was apparent to Sergeant Thao before he destroyed the evidence.

The findings here sharply contrast with the decisions of this Court in *Nichols* and *McCarthy*. In *Nichols*, the Wisconsin Court of Appeals

concluded that the destroyed evidence "lacked any exculpatory value." 108 F.4th at 555. In *McCarthy*, the Wisconsin Court of Appeals concluded "there was, and is, no showing that the vehicle possessed an exculpatory value that was apparent before it was destroyed." 656 F.3d at 482. But here, the Wisconsin courts concluded the interview recordings were "potentially exculpatory," and the exculpatory value was apparent to the State before it destroyed the evidence. Additional App. 17–18; Additional App. 29–31.

Finally, Chong can prove "conscious effort to suppress exculpatory evidence" as articulated in *Jones*, as the Wisconsin court found that the State intentionally destroyed this evidence with "forethought." *Jones*, 965 F.2d at 477; Additional App. 18. Chong has unequivocally satisfied this element.

### 3.   Chong cannot obtain comparable evidence.

The destroyed interview recordings were "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 489. In *Trombetta*, the Supreme Court explained that it has "long interpreted" the Due Process Clause's "standard of fairness to require that criminal defendants be

afforded a meaningful opportunity to present a *complete* defense." *Id.* at 485 (emphasis added).

This is not a case where the interview recordings were destroyed, but the transcripts remained available. It is not even a case where interview recordings were destroyed but some contemporaneous notes summarize the key information learned. Putting aside his decision to destroy the recordings and maps, Sergeant Thao's other "unusual practices" in connection with those three interviews leave us without transcripts (or even notes) about the December 2013 interviews. Dkt. 26-13, at 52.

In addition to applying *Youngblood* and *Trombetta* contrary to clearly established law, the Wisconsin Court of Appeals unreasonably applied *Youngblood* and *Trombetta* when it concluded that the April 2015 interviews of these three witnesses were comparable evidence. *Bell*, 535 U.S. at 694. These interviews were done over a year after the shooting. Absent any transcripts or notes, the destruction of the 2013 recordings left Chong wholly unable to determine whether each witness's 2015 memory (or veracity) matched squared with the stories they told in 2013—stories that apparently caused police to zero in on Paul as the shooter, not Chong. The Wisconsin Court of Appeals explained that

34

Chong could have called these three witnesses at trial (and could have impeached them had they testified inconsistently with their April 2015 interviews). Additional App. 17. But the April 2015 interviews—which Sergeant Thao organized only after the State's inadvertent disclosure of these witnesses' existence—are not the interviews conducted when police were still trying to learn what happened. They are not the interviews that caused police to focus on, and then arrest, Paul for the shooting. They are interviews that police created after Chong was already facing a murder charge so they would have something to turn over if he asked for transcripts of interviews with the inadvertently disclosed witnesses.

Chong satisfies all the elements of *Trombetta* and *Youngblood*, and this Court may grant him relief. 28 U.S.C. § 2254(d)(1); *Bell*, 535 U.S. at 694.

### C. The Wisconsin courts' failure to provide a meaningful remedy was an unreasonable application of *Youngblood* and *Trombetta*.

This Court—along with its sister Circuits—has acknowledged the difficulty of fashioning remedies for the unconstitutional destruction of evidence. "Destruction is not easy to remedy," as this Court has explained. *Armstrong*, 786 F.3d at 552. "Deliberate destruction of evidence

with potential or apparent exculpatory value can make it *impossible* for the accused to receive due process of law, regardless of the procedural posture of the criminal case at the time of the destruction." *Id.* (emphasis added). "The outright destruction of exculpatory evidence raises immediate constitutional concern because the resulting prejudice to the defense is permanent." *Id.* "Whatever unfairness results from the destruction will infect all future proceedings because the exculpatory evidence will continue to be unavailable." *Id.*

Because the State destroyed exculpatory evidence in bad faith, Chong moved for dismissal of this charge, or in the alternative, suppression of the "any in court identification of Chong" by the three witnesses and any testimony by those witnesses "that links Chong . . . to the homicide in this case." Additional App. 21, n.12. The trial court fashioned a remedy that did neither. Instead, it suppressed these witnesses entirely for the State. When Chong asked what the defense was allowed to do, the trial court advised that if the defense needed to call these witnesses for something, doing so would open the door to *all* issues. That left Chong with a Hobson's choice. Either give up on calling those witnesses altogether. Or risk putting them on the stand and opening the door to

whatever prosecutors might elicit from them, without any ability to impeach them with the stories they told police in 2013. The stories they told when the information was freshest in their minds. The stories that caused police to zero in on, and arrest, Paul instead of Chong.

This is the classic prejudicial destruction case. It is *impossible* for Chong to receive due process of law because of the State's deliberate destruction of this evidence. *Cf. Armstrong*, 786 F.3d at 552. He will never know what these eyewitnesses said in December 2013 that caused officers to immediately question, and then arrest, Paul. Dismissal was the proper remedy for this permanent prejudice.

Even if the Court believes this prejudice could have been cured, the remedy that the trial court fashioned did not. Indeed, the trial court's remedy further prejudiced Chong. Chong should have been able to put three eyewitnesses on the stand who apparently did *not* identify him as the shooter when interviewed by policy in the days after the shooting, and instead said something that caused police to believe Paul was the shooter, not Chong. But under the remedy crafted by the trial court, calling these witnesses would have opened the door to anything prosecutors might then have elicited from them in a circumstance where Chong had

no way to impeach them with what they said in December 2013. At a minimum, Wisconsin courts needed to provide a remedy that afforded Chong a meaningful opportunity to present a complete defense. *See McCarthy*, 656 F.3d at 483. Their failure to do so is an unreasonable application of *Youngblood* and *Trombetta*.

Short of dismissal, courts have fashioned many remedies for the prejudice inflicted by a state's intentional destruction of helpful evidence. For example, many courts have found that an adverse inference instruction can remedy the failure to preserve evidence in a criminal case. *E.g.*, *U.S. v. Hannah*, No. 18-CR-30071, 2021 WL 3173571, at *13 (C.D. Ill. July 27, 2021). Some Circuits have held that bad faith is required to obtain an adverse inference instruction. *See*, *e.g.*, *U.S. v. Braswell*, 704 Fed. App'x. 528, 535 (6th Cir. 2017) (adverse inference instruction appropriate in a criminal case only if there is bad faith); *U.S. v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000) (finding no spoliation instruction necessary where there was no evidence of bad faith conduct by the government); *U.S. v. Romo-Chavez*, 681 F.3d 955, 961 (9th Cir. 2012) (requiring the defendant establish "(1) that the evidence was destroyed in bad faith, and (2) that he was prejudiced by its destruction," prior to giving

a spoliation instruction). Others have applied a balancing test, whereby negligent destruction may be sufficient in certain circumstances. *See*, *e.g.*, *U.S. v. Sivilla*, 714 F.3d 1168, 1173–74 (9th Cir. 2013) (reversing for a new trial with instructions to grant the defendant a remedial jury instruction); *U.S. v. Laurent*, 607 F.3d 895, 902 (1st Cir. 2010) (a spoliation instruction "usually makes sense only where the evidence permits a finding of bad faith destruction; ordinarily *negligent* destruction would not support the logical inference that the evidence was favorable to the defendant," but noting that there may be instances where a spoliation instruction might still make sense with negligent destruction); *U.S. v. Garcia*, 596 Fed. App'x. 24, 26 (2d Cir. 2015) (noting that bad faith is not necessary to justify an inference of spoliation, and it "may be appropriate in some cases involving the negligent destruction of evidence," but also finding that the defendant must show "that the missing [evidence] [is] 'material in the sense that its suppression undermined confidence in the outcome of the trial.'"). Chong would be entitled to an instruction under either approach.

Because of the State's intentional destruction of evidence, Chong will *never* have access to whatever these eyewitnesses said that led

officers to immediately question, and then arrest, Paul. Because it is impossible to remedy this prejudice, dismissal is the only real remedy. And if the Court disagrees and concludes this prejudice could somehow be remedied, the Wisconsin courts failed to fashion a remedy that reasonably applies *Youngblood* and *Trombetta*.

## II.    The State violated Chong's due process rights under *Brady*.

As a separate basis for relief, Chong should be granted a new trial because the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court interpreted the Fourteenth Amendment's Due Process Clause to mandate "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material [ ] to guilt . . . irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The State must disclose exculpatory evidence whether or not the accused requests it. *U.S. v. Agurs*, 427 U.S. 97, 107 (1976). A *Brady* violation exists when (1) evidence is favorable to the accused; (2) the State suppressed the favorable evidence; and (3) the State's suppression of favorable evidence prejudiced the defendant. *Strickler v. Greene*, 527 U.S. 263, 263–64 (1999). A *Brady* violation justifies a new trial "irrespective of the good

faith or bad faith of the prosecution." *Giglio v. U.S.*, 405 U.S. 150, 153–54 (1972) (quoting *Brady*, 373 U.S. at 87). "The critical question under *Brady* is whether the exculpatory evidence is 'disclosed in time for the defendant to make use of it.'" *Armstrong*, 786 F.3d at 552 (quoting *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001)).

### A.    The State suppressed the interview recordings and maps.

The State previously conceded that the Appleton Police Department suppressed the evidence of the initial interviews of Ryan Thao, Mikey Thao, and Watou Lee. Additional App. 8. It failed to disclose that evidence to Chong for over a year, during which time it destroyed all evidence of those interviews, including the maps they drew of where the shooter came from in the Luna Lounge. Dkt. 26-13, at 52; Dkt. 26-15, at 43. The State never intentionally disclosed these witnesses' existence to Chong; it inadvertently tipped them off with the whiteboard picture. Dkt. 26-12 at 56, 63–64. Even then, the State *still* did not disclose that these witnesses had already been interviewed (immediately before police arrested Paul). *Id.* Instead, the State asked them to be interviewed again so they had a statement to turn over to Chong's counsel should she talk to them and learn that they'd spoken with police. Dkt. 26-12, at 61; Dkt.

26-14, at 74. Only after Chong's counsel put Sergeant Thao on the stand during the hearing did Sergeant Thao finally confirm the earlier interviews and admit intentionally destroying the recordings. Dkt. 26-12, at 30–32.

### B.    The suppressed evidence was material.

For a *Brady* violation, the evidence must have been "favorable" to the accused, and its suppression must have prejudiced the accused. 373 U.S. at 87. As the Supreme Court has explained, "favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *U.S. v. Bagley*, 473 U.S. 667, 682 (1985)). "To prevail on his *Brady* claim," Chong "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted." *Wearry v. Cain*, 577 U.S. 385, 392 (2016) (quoting *Smith* v. *Cain*, 565 U. S. 73, 75 (2012)). Rather, he must show only that "there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.'" *Id.* (quoting *Giglio*, 405 U.S. at 154).

In *Kyles*, the Supreme Court explained how *Bagley* emphasized

three aspects of materiality under *Brady*. 514 U.S. at 434. First, "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." *Id.* "*Bagley*'s touchstone of materiality is a 'reasonable probability' of a different result, and the adjective is important." *Id.* "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* A defendant must therefore establish only a "reasonable probability" of a different result by showing that the government's evidentiary suppression "undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678. Second, materiality is *not* a sufficiency-of-evidence test. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict." *Kyles*, 514 U.S. at 434–35. "One does not show a *Brady* violation by demonstrating that some of the inculpatory evidence should have been excluded, but by

showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435. Third, materiality of suppressed evidence must be "considered collectively." *Id.* at 436.

The Wisconsin Court of Appeals unreasonably applied *Brady* and *Bagley* to the facts here. The December 2013 interviews occurred contemporaneously after the shooting, and officers immediately arrested *Paul* Lee after questioning Mikey Thao, Ryan Thao, and Watou Lee. Neither the later interviews of these witnesses nor Sergeant Thao's testimony explain what these witnesses said that connected Paul to the shooting. Moreover, all three witnesses knew Chong, or knew of him, yet did not identify him as the shooter they saw.[1] Mikey Thao knew Chong from growing up in the community together and going to the same school. Dkt. 26-14, at 99. Mikey saw the shooter, yet apparently did *not* identify Chong—who he'd known since childhood. *Id.* Ryan Thao knew the Lee family and described the shooter coming into the bar area, but he too failed to identify Chong as the shooter. Dkt. 26-15, at 20; Dkt. 26-12 at 51–52. Watou Lee knew of the Lee family through his friendship with

---

[1] Courts have found evidence to be "undeniably favorable" under *Brady* when an eyewitness who knew the defendant but failed to identify him. *McNeill v. Bagley*, 10 F.4th 588, 598 (6th Cir. 2021).

Mikey and Ryan. Dkt. 26-15, at 40. Watou saw the shooter's path as they walked through the bar, and he didn't identify Chong as the shooter, either. Dkt. 26-15, at 42.

Yet the Wisconsin Court of Appeals somehow concluded this testimony "did not exculpate Chong," so it "did not meet the test for materiality." Additional App. 12. This testimony "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. In a case relying on eyewitness testimony and no physical evidence, this Court explained that "one cannot summarily discount the possibility that the outcome of the trial might have been different had the jury heard credible testimony from other eyewitnesses." *U.S. ex rel. Hampton v. Leibach*, 347 F.3d 219, 256 (7th Cir. 2003). But the Wisconsin Court of Appeals did precisely that. It concluded the State introduced "strong evidence" of Chong's guilt at trial, pointing to seven confessional witnesses. Additional App. 13–14. But the Wisconsin Court of Appeals failed to consider how the suppressed evidence of actual *eyewitnesses* would affect the State's case of confessional witnesses and no physical evidence tying Chong to this crime. *Id.* The State was unable to recover the murder weapon or DNA evidence. As the Supreme Court has

directed, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Agurs*, 427 U. S. at 113.

Yet the Wisconsin Court of Appeals concluded it was "pure speculation" that the interview recordings "must have supported a theory that Paul was the shooter," even though police immediately turned their focus to Paul after those interviews and arrested him later the same day. Additional App. 10–11; *see* Dkt. 26-14, at 81. But *Bagley*'s "touchstone of materiality" requires only "a 'reasonable probability' of a different result, and the adjective is important." *Kyles*, 514 U.S. at 434. The Wisconsin Court of Appeals failed to reasonably apply *Brady* and *Bagley*, and consider whether these would have a reasonable probability of a different result, which "is accordingly shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (quoting *Bagley*, 473 U.S. at 678). Chong need not demonstrate "by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant)." *Kyles*, 514 U.S. at 434. The

interviews could have introduced reasonable doubt about whether Chong shot Richards or whether the actual shooter was Paul. *See, e.g., Harris v. Lafler*, 553 F.3d 1028, 1033 . (6th Cir. 2009) (concluding suppressed evidence was material because it would have impeached "the *only* piece of eyewitness evidence that directly linked Harris to the shooting" and, without it "the prosecution's case was circumstantial."); *Smith*, 565 U.S. at 76 (concluding suppressed evidence was material when the testimony that would have been impeached was "the *only* evidence linking [the defendant] to the crime" and the withheld statements "directly contradict[ed] [the witness's] testimony.").

## C.   The suppression of the material evidence prejudiced Chong.

The Wisconsin Court of Appeals also unreasonably applied *Brady* and *Bagley* when it determined that Chong was not prejudiced. First, the Wisconsin Court of Appeals unreasonably determined the suppressed witness interviews had no material effect on Chong's case preparation and trial strategy because the State provided his counsel with the April 2015 round of interviews. Although the Supreme Court has cautioned against using trial preparation as the standard for materiality, *Agurs*, 427 U.S. at 112 n.20, the Wisconsin Court of Appeals—relying on state

47

precedent—stated it may "consider the effect that suppression might have had on the preparation or presentation of the defendant's case," Additional App. 12. It thus concluded there was no evidence the State's suppression of the evidence altered Chong's trial strategy. *Id.* This is not how the Supreme Court has determined materiality. And as discussed above, the State's suppression—and the subsequent "remedy" by the trial court—did alter his trial strategy. "The critical question under *Brady* is whether the exculpatory evidence is 'disclosed in time for the defendant to make use of it.'" *Armstrong*, 786 F.3d at 552 (quoting *Grintjes*, 237 F.3d at 880). It should go without saying that disclosing the existence of material evidence only *after* the State has destroyed it is disclosure too late "for the defendant to make use of it." *Cf. id.* Chong does not know, and can now never know, what the three witnesses said in their interviews or how the material could have affected his case.

The Wisconsin Court of Appeals likewise also concluded that Chong was not prejudiced because the State had the "strong case" of seven confessional witnesses. As previously explained, this conclusion is unreasonable.

In sum, the State violated *Brady* by permanently suppressing the

three eyewitness interviews that that sent police in pursuit of Paul, not Chong. The eyewitnesses either knew Chong, or knew of him, and did not identify him nor a person with his clothing as the Luna Lounge shooter. In the context of the evidence presented, the eyewitness interviews were crucial and Chong was prejudiced by their suppression.

Once there has been a *Brady* violation, "it cannot subsequently be found harmless under [*Brecht v. Abrahamson*, 507 U.S. 619, 621 (1993)]." *Kyles*, 514 U.S. at 436. A conviction "tainted by constitutional error must be set aside." *Id.* And while a *Brady* violation justifies a new trial even absent bad faith, here we have it. *Cf. Giglio*, 405 U.S. at 153–54 (quoting *Brady*, 373 U.S. at 87). Chong Lee is entitled to a new trial to remedy Wisconsin's *Brady* violation.

## CONCLUSION

The Wisconsin Court of Appeals applied *Youngblood* and *Trombetta* contrary to clearly established federal law. Chong is entitled to a remedy under *Youngblood* and *Trombetta*, and the Wisconsin courts failed to provide one sufficient to cure the constitutional violation. Under *Brady*, the Wisconsin Court of Appeals unreasonably applied *Brady* to the facts of Chong's case. The Wisconsin Court of Appeals' decision should therefore

be set aside even under AEDPA's deferential standard.

For all of those reasons, the Court should reverse the district court's judgment and remand with instructions to issue an order granting the writ of habeas corpus unless the State of Wisconsin provides Chong with a new sentencing hearing within 180 days.

Filed: April 7, 2025.                 Respectfully submitted,

                                      CHONG LEE,
                                      *By Counsel*

                          By    /s/ *Christine A. Walsh*
                                Christine A. Walsh
                                Sydney Darnall
                                TAFT STETTINIUS & HOLLISTER LLP
                                One Indiana Square, Suite 3500
                                Indianapolis, IN 46204
                                Tel.: (317) 713-3500
                                Fax: (317) 713-3699
                                cwalsh@taftlaw.com
                                sdarnall@taftlaw.com

                                Benjamin S. Morrell
                                TAFT STETTINIUS & HOLLISTER LLP
                                111 East Wacker Drive, Suite 2600
                                Chicago, IL 60601
                                Tel.: (312) 527-4000
                                Fax: (312) 527-4011
                                bmorrell@taftlaw.com

*Appointed Counsel for Petitioner-Appellant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I hereby certify that the foregoing document complies with the type-volume limitation of Rule 32(a)(7)(B)(i), as modified by Circuit Rule 32(c). It contains 10,448 words.

I further certify that the foregoing document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6), as modified by Circuit Rule 32(b). It has been prepared using Microsoft Word 2016 in the proportionally spaced typeface of Century Schoolbook, in 14-point font size.

Dated: April 9, 2025.

By /s/ *Christine A. Walsh*

## CERTIFICATE OF SERVICE

I certify that on the date listed below, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: April 9, 2025.

By /s/ *Christine A. Walsh*

## STATEMENT THAT ALL REQUIRED MATERIALS
## ARE IN APPENDICES

I certify that the following required short appendix includes all materials required under part (a) of Circuit Rule 30.

I certify that the additional appendix, filed separately, includes all materials required under part (b) of Circuit Rule 30.


Dated: April 9, 2025.

By /s/ *Christine A. Walsh*

No. 24-2647

In the

# United States Court of Appeals
# for the Seventh Circuit

CHONG LEE,

*Petitioner-Appellant,*

v.

BRADLEY MLODZIK,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Wisconsin
No. 2:22-cv-00620-WCG

## REQUIRED SHORT APPENDIX

Christine A. Walsh
Sydney Darnall
TAFT STETTINIUS &
HOLLISTER LLP
One Indiana Square
Suite 3500
Indianapolis, IN 46204
Tel.: (317) 713-3500
Fax: (317) 713-3699
cwalsh@taftlaw.com
sdarnall@taftlaw.com

Benjamin S. Morrell
TAFT STETTINIUS &
HOLLISTER LLP
111 East Wacker Drive
Suite 2600
Chicago, IL 60601
Tel.: (312) 527-4000
Fax: (312) 527-4011
bmorrell@taftlaw.com

*Appointed Counsel for Petitioner-Appellant*

# TABLE OF CONTENTS

Decision and Order Denying Writ of Habeas Corpus,

    Dkt. 44 (September 6, 2024) ............................................................ Short App. 1

Final Judgment, Dkt. 45 (September 6, 2024) ...................................... Short App. 17

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHONG L. LEE,

        Petitioner,

     v.                                      Case No. 22-C-620

BRAD MLODZIK,

        Respondent.

---

**DECISION AND ORDER DENYING WRIT OF HABEAS CORPUS**

---

Petitioner Chong L. Lee, who is currently incarcerated at Waupun Correctional Institution, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. He seeks relief from his conviction and sentence for first-degree intentional homicide with use of a dangerous weapon, felon in possession of a firearm, and two counts of intimidating a witness as a party to a crime. Chong Lee was convicted in Outagamie County Circuit Court and was sentenced to life in prison with extended supervision eligibility beginning on February 1, 2048. Dkt. No. 26-2. At screening, the court determined that Chong Lee was allowed to proceed on four of his six asserted grounds for relief and directed the Respondent to either file a motion seeking dismissal or answer the petition. Dkt. No. 13 at 9–10. Respondent answered the petition, and the case is now fully briefed. For the following reasons, the court will deny Chong Lee's petition for writ of habeas corpus.

## BACKGROUND

The background facts are the same as the court outlined in its September 26, 2022 order denying Lee's motion to stay and screening his petition. Dkt. No. 13. Unless otherwise indicated, these facts are taken from the Wisconsin Court of Appeals' decision affirming the judgment of

conviction.  *State v. Lee*, No. 2018AP1741-CR, 2020 WI App 6, 390 Wis. 2d 426, 939 N.W.2d

427 (Table); Dkt. No. 26-6.  At approximately 1:50 a.m. on December 8, 2013, police responded

to a call regarding a possible gunshot at the Luna Lounge in Appleton, Wisconsin.  *Lee*, 390 Wis.

2d 426, ¶ 2.  When officers arrived, they found the victim, Joshua Richards, who had been fatally

shot in the head, on the floor near the bar's entrance.  *Id.*  A Luna Lounge security guard told police

that "two Asian individuals" had left the scene after the shooting and that they were wearing white

vests and white hats.  *Id.* ¶ 3.  Video footage from nearby traffic cameras and a security camera

inside the Luna Lounge showed three individuals, who were later identified as Joe Thor, Paul Lee,

and Phong Lee, running out of the building just after the shooting.  The security camera footage

also showed other individuals, including Chong Lee, exiting the Luna Lounge shortly after the

shooting.  *Id.*  Chong Lee and Paul Lee are brothers.  *Id.*  (Because several of the individuals

involved have the last name "Lee," for clarity, the court will use Chong Lee's first name to refer

to him.)

Three days later, on December 11, 2013, police interviewed three possible witnesses to the

shooting: Watou Lee, Mikey Thao, and Ryan Thao.  *Id.* ¶ 4.  The interviews were recorded.  None

of them identified Chong as the shooter.  *Id.*  Ryan Thao provided a description of the shooter's

clothing and stated that the shooter had come "from the bar into the foyer area with other people."

*Id.*  Mikey Thao and Watou Lee also provided a description of the shooter.  *Id.*  All three witnesses

told police that they were "very concerned" for their safety and "did not want to be identified" or

"get involved" in what appeared to be a gang shooting.  *Id.*  That same day, police interviewed

Paul Lee at his place of work. *Id.* ¶ 5.  They did not ask Paul Lee about Chong during that interview

because, at the time, they did not have any information suggesting that Chong was the shooter.  *Id.*

After about one-and-a-half hours, Paul Lee was taken into custody and transported to the Appleton

police station.  *Id.*  In the meantime, other officers interviewed "several females" who stated that Chong had "made some statements to them admitting to doing the shooting."  *Id.* ¶ 6.  Joe Thor also told police that Chong had admitted to being the shooter and disposing of the gun.  *Id.*  On December 12, 2013, police interviewed Paul Lee two more times while he was in custody at the Appleton police station.  *Id.*  During the second of those interviews, Paul Lee told police that Chong was the shooter.  *Id.*

On December 16, 2013, a criminal complaint was filed charging Chong with one count of first-degree intentional homicide by use of a dangerous weapon and one count of possession of a firearm by a felon.  *Id.* ¶ 7.  An information filed in March 2014 added four counts of felony intimidation of a witness as a party to the crime, as well as a charge of solicitation of perjury, which was later dismissed.  *Id.*  The State did not initially disclose to the defense that shortly after the shooting, police had interviewed Watou Lee, Mikey Thao, and Ryan Thao.  *Id.* ¶ 8.

The recordings of the interviews were retained for seven or eight months, before police destroyed them.  *Id.*  An officer later testified that the recordings were destroyed because the witnesses had requested that the police not disclose their identities and because the police "knew through discovery the defense would be able to obtain [the recordings]."  *Id.* ¶ 8.  Police were concerned about the safety of the witnesses and also feared that disclosure of the witnesses' statements could subject law enforcement to liability under what they knew as "the Monfils law" if such disclosure led to violence against the witnesses.  Dkt. No. 26-12 at 65.  The "Monfils law" refers to an amendment to Wisconsin's Open Records law, Wis. Stat. § 19.35(1), enacted in response to the murder of Thomas Monfils following the release of a recording of an anonymous report of a crime he made to the Green Bay Police Department to the person who reportedly committed the crime.  *See Monfils v. Taylor*, 165 F.3d 511 (7th Cir. 1998).  The chief deputy who

3

failed to prevent the disclosure was held civilly liable for Monfils' death. The amendment added an exception to the general duty to allow the public to inspect government records where release of a record would "endanger an individual's life or safety." Wis. Stat. § 19.35(1)(am)2.a.

In the meantime, at some point, police inadvertently disclosed the identities of Watou Lee, Mikey Thao, and Ryan Thao to the defense. *Id.* ¶ 9. Police reinterviewed them in April 2015, and recordings and reports of those interviews were provided to the defense. *Id.* Based on that evidence, one of Chong's attorneys noted during a May 2015 motion hearing that it was clear police had interviewed the three witnesses before, and she requested "all reports, notes, and recordings of the initial interviews of these three individuals." *Id.* The defense then learned that the recordings of the December 2013 interviews had been destroyed. *Id.*

In September 2015, Chong moved to dismiss the first-degree intentional homicide charge, arguing that police had violated his right to due process by failing to disclose, and by later destroying, the recordings of the December 2013 interviews of Watou Lee, Mikey Thao, and Ryan Thao. *Id.* ¶ 10. Alternatively, Chong requested that the court suppress "any in court identification of Chong" by Watou Lee, Mikey Thao, and Ryan Thao and any testimony by those witnesses "that links Chong . . . to the homicide in this case." *Id.* The circuit court concluded that police had violated Chong's right to due process by destroying potentially exculpatory evidence in bad faith. *Id.* The court determined, however, that dismissal of the homicide charge was not an appropriate remedy and instead prohibited the State (but not Chong) from calling Watou Lee, Mikey Thao, and Ryan Thao to testify at trial. *Id.*

Chong's trial began in February 2016 and lasted eleven days. *Id.* ¶ 11. At trial, there was evidence that seven individuals had heard Chong confess to his involvement in the shooting, and an officer testified that Paul Lee had told police that Chong was the shooter. *Id.* Before trial, the

court ruled that evidence of Chong's statements to others that he would "beat this case" was inadmissible. *Id.* ¶ 12. Nevertheless, one witness, during her testimony, read a letter Chong had written to her following his arrest that included the statement, "I'm pretty sure I'll beat this case though." *Id.* Chong's trial attorneys did not object to that testimony. *Id.* The jury asked to see the letter during deliberations. *Id.* While there is no transcript of any discussion between the court and the parties regarding the jury's request, the record shows that the letter was provided to the jury. *Id.* The jury found Chong guilty of first-degree intentional homicide with use of a dangerous weapon, felon in possession of a firearm, and two counts of intimidating a witness as a party to a crime. *Id.* ¶ 13. Chong subsequently moved for postconviction relief, arguing, among other things, that his trial attorneys were ineffective by failing to object when the witness read the letter during her trial testimony. *Id.*

At a *Machner* hearing, Chong's lead trial attorney testified that she had no recollection as to why the defense did not object when the letter was read at trial. *Id.* ¶ 14. While she agreed that there likely were "discussions" between the circuit court and the parties about "issues that came up" after the jury began deliberating, she had no specific memory of those discussions. *Id.* During her testimony, the court similarly stated that it had no "independent recollection" of any discussion regarding the jury's request to see the letter. *Id.* Co-counsel also testified that he could not recall why the defense did not object when the letter was read at trial. *Id.* ¶ 15. He explained that the parties spent "quite a bit of time in chambers going through" various pieces of evidence and that the court made rulings in chambers as to what evidence was admissible. *Id.* He stated, "I don't have a specific recollection as to this letter and what the decisions were, but I do remember that we tried to carefully go through these before they were being presented to the witnesses as far as what was coming in and what was not coming in." *Id.* He further testified that he remembered

5

the jury had asked questions during its deliberations and that he believed the parties reconvened in the courtroom to discuss those questions, but he could not recall whether he objected during those discussions to the court sending the letter to the jury. *Id.* ¶ 16.

After the hearing, Chong argued that he had been denied his right to a meaningful appeal because there were no transcripts of the court's discussions with the parties regarding the admissibility of the letter and the jury's request to review it during deliberations. *Id.* ¶ 17. He asserted that, due to the lack of transcripts, he was "unable to show that counsel was deficient in failing to object because it is quite possible that counsel did object when this issue was address[ed] in chambers." *Id.* (alterations in original). Chong argued, in the alternative, that "if counsel did object in chambers, and the Court nonetheless ruled the evidence admissible, [Chong] cannot show that the Court erroneously exercised [its] discretion because there is no record of the Court's reasoning." *Id.* (alterations in original).

The circuit court denied the postconviction motion. *Id.* ¶ 18. It rejected Chong's claim that any missing transcripts deprived him of his right to a meaningful appeal, concluding that Chong had not demonstrated a "colorable need" for those transcripts. *Id.* Regardless, the court concluded that Chong could not show that absence of the transcripts had caused him any prejudice. *Id.* Chong appealed to the Wisconsin Court of Appeals, arguing that (1) the State violated his right to due process by failing to disclose the December 2013 interviews of Watou Lee, Mikey Thao, and Ryan Thao; (2) the State violated his right to due process by intentionally destroying the recordings of those interviews; and (3) the missing transcripts deprived him of his right to a meaningful appeal. *Id.* ¶ 19. The Wisconsin Court of Appeals affirmed. *Id.* ¶ 1. Chong went on to petition the Wisconsin Supreme Court for discretionary review, which was denied on July 15, 2020. Dkt. No. 26-9. The Supreme Court of the United States denied Chong's petition for writ of

certiorari on May 24, 2021. Dkt. No. 26-11. Thereafter, Chong filed his § 2254 petition with this court.

## LEGAL STANDARD

Chong's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254, which limits the power of federal courts to grant writs of habeas corpus based on claims that were adjudicated on the merits by a state court. Under AEDPA, a federal court may grant habeas relief when a state court's decision on the merits was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by" United States Supreme Court decisions, or was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d); *see also Woods v. Donald*, 575 U.S. 312, 315–16 (2015). A state court decision is "contrary to . . . clearly established Federal law" if the court did not apply the proper legal rule or, in applying the proper legal rule, reached the opposite result as the Supreme Court would have on "materially indistinguishable" facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court's decision is an unreasonable application of established precedent when that state court applies Supreme Court precedent in "an objectively unreasonable manner." *Id.* In addition, the determination of factual issues made by a state court is presumed to be correct and such presumption can only be overcome by of clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Under the standard set forth by Section 2254(d) of AEDPA, federal courts are "limited to a deferential review of the reasonableness, rather than the absolute correctness, of a state court decision." *Mosley v. Atchison*, 689 F.3d 838, 844 (7th Cir. 2012) (citation omitted); *see also Searcy v. Jaimet*, 332 F.3d 1081, 1087 (7th Cir. 2003) (observing that AEDPA "significantly constrain[s] any federal court review of a state court conviction"). This is, and was meant to be,

7

an "intentionally" difficult standard to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 575 U.S. at 316 (quoting *Harrington*, 562 U.S. at 103).

## ANALYSIS

Chong asserts four grounds for relief: (1) his due process rights were violated pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), when the State failed to disclose the existence of the recorded December 2013 police interviews of Watou Lee, Mikey Thao, and Ryan Thao; (2) his due process rights were violated pursuant to *Arizona v. Youngblood*, 488 U.S. 51 (1988), when the state intentionally destroyed the recordings of those interviews; (3) missing transcripts of the trial proceedings deprived him of the right to a meaningful appeal; and (4) ineffective assistance of trial counsel based on trial counsel's failure to object to hearsay statements, pursue a motion to suppress Chong Lee's statements, and object to evidence that was previously ruled to be inadmissible from being heard by the jury and reaching the jury during deliberations.

### A. Destruction of Evidence

Chong claims that the State's failure to disclose the existence of the December 2013 recorded police interviews of Watou Lee, Mikey Thao, and Ryan Thao, and subsequent destruction of the recordings violated his due process rights under *Brady v. Maryland* and *Arizona v. Youngblood*. *Brady* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Shortly thereafter, the Court made clear that "the duty to disclose such evidence is applicable even though

8

Short App. 8

there has been no request by the accused." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)). The duty to disclose "encompasses impeachment evidence as well as exculpatory evidence." *Id.* Accordingly, "[t]here are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Id.* at 281–82. "[F]avorable to an accused" means such evidence that, "if disclosed and used effectively, it may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985). The materiality requirement of *Brady* encompasses the question of prejudice, which means relief should be granted "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 682.

*Youngblood* and *California v. Trombetta*, 467 U.S. 479 (1984), "govern a state's duty under the Due Process Clause of the Fourteenth Amendment to preserve evidence on behalf of a defendant." *McCarthy v. Pollard*, 656 F.3d 478, 484 (7th 2011). *Youngblood* is essentially an extension of *Brady* to physical items of evidence that might be favorable to the defense. *Nichols v. Weirsma*, 108 F.4th 545, 553 (7th Cir. 2024). Although in this case the Wisconsin Court of Appeals analyzed the issue separately under *Brady* and *Youngblood*, the issue presented was really a question of preservation of evidence, as opposed to disclosure. The fact that police had previously interviewed Watou Lee, Mikey Thao, and Ryan Thao was disclosed to the defense long before trial. It was the destruction of the recordings of the interviews that the defense claimed violated his right to due process of law and warranted dismissal of the charges against Chong.

In *McCarthy*, the Seventh Circuit explained that it's interpretation of *Trombetta* and *Youngblood* differs from that of Wisconsin courts. 656 F.3d at 484. The Seventh Circuit, which

is the controlling law in this court, "read[s] both cases to stand for the same proposition: the destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *Id.* Although the Wisconsin Court of Appeals did not apply precisely this test, its analysis falls well within the bounds of a reasonable application of both *Youngblood* and *Trombetta,* as understood by the Seventh Circuit.

To be sure, the Court of Appeals accepted the trial court's finding that the recordings had been destroyed in bad faith as "not clearly erroneous." Dkt. No. 26-6 ¶ 45. At the same time, the state appellate court noted that the trial court had "cited certain mitigating factors suggesting that it did not believe a high degree of bad faith was present." *Id.* ¶ 49. For example, "the [trial] court conceded that the destruction of evidence was motivated, at least in part, by the officers' desire to protect the witnesses' identities." *Id.* Indeed, according to the testimony at the motion hearing, the officers believed they were dealing with a gang murder. According to the testimony of at least one of the officers, they feared disclosure of the witnesses' identities would place them at serious risk of harm and potentially subject the officers and department to civil liability. Dkt. No. 26-12 at 40:13–16; 57:18–58:02; 65:06–14. The Court of Appeals also noted that the trial court had stated it did not believe that the police "engaged in intentional destruction of evidence in an attempt to usurp Chong's right to a fair trial." *Id.* Though these observations, when considered with the state courts' findings that the original witness statements were not exculpatory, are difficult to square with the trial court's finding of bad faith, it is not the role of this court to review a finding Respondent does not challenge.

Notwithstanding the state courts' findings of bad faith, Chong's due process argument based on the destruction of evidence fails. Chong argues that the December 2013 interviews were favorable to him as exculpatory evidence because Mikey Thao, who claimed to have seen the shooter and was the only one of the three witnesses that knew Chong before the night of the shooting, failed to identify Chong as the shooter and told police that he thought Chong was in jail on that night. Pet'r's Br. in Supp. at 4, Dkt. No. 31. The Wisconsin Court of Appeals rejected Chong's argument, concluding that such a statement was not favorable to him as exculpatory "because video evidence established that Chong was, in fact, at the Luna Lounge when the shooting occurred." *Lee*, 390 Wis. 2d 426, ¶ 26. In other words, had the evidence been disclosed, it would not have made the difference between conviction and acquittal.

Chong further contends that the State court erroneously concluded that, because Chong was at Luna and was seen on camera, the fact that Mikey Thao was unable to identify Chong as the shooter had no exculpatory value. He contends that this conclusion was "really incorrect and contradicts . . . laws set by the Supreme Court of the United States." Pet'r's Br. in Supp. at 3. Chong further argues that the suppressed evidence was favorable to him for impeachment purposes. He also claims that in the April 2015 interview, Mikey Thao described the shooter's clothing, but it did not match the clothes he was wearing. Instead, Chong claims the clothing Mikey Thao described was similar to that of another person who was involved in the case. Chong notes that the Officers testified that in their first interviews with Thao, he did not mention Chong's name and did not recall anything else. These remarks, Chong contends, constitute *Brady* material in that it suggests he was not the shooter. Pet'r's Reply Br. at 4, Dkt. No. 42.

The question that arises, however, is if the statements of Watou Lee, Mikey Thao, and Ryan Thao were exculpatory, why were they not called as witnesses for the defense? Chong offers

no evidence that their statements had changed between the first and second interviews, or that their testimony would have been different had they testified at trial. In other words, he has failed to establish that the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means, namely, in the form of the live testimony of the same witnesses. Nothing prevented Chong from calling all three as witnesses if he thought their inability to identify him three days after the shooting would have helped him. Had they testified inconsistently with the initial statements, he could have impeached them by calling the officers who interviewed them. Absent a showing that their testimony would have been different at trial than in the December 2013 interviews, Chong's claim that the December 2013 interviews were exculpatory must fail.

The Wisconsin Court of Appeals also concluded that the December 2013 interviews of Watou Lee, Mikey Thao, and Ryan Thao were not material to the determination of Chong's guilt. The Wisconsin Court of Appeals correctly recognized that "[e]vidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense." *Lee*, 390 Wis. 2d 426, ¶ 29 (citing *State v. Harris*, 2004 WI 64, ¶ 14, 272 Wis. 2d 80, 680 N.W.2d 737). Applying that standard, it offered three reasons why the December 2013 interviews were not material. *Id.* ¶ 30. "First, as discussed above, those interviews did not exculpate Chong." *Id.* Second, "there is no evidence that the State's suppression of the December 2013 interviews altered Chong's trial strategy." Defense counsel had copies of the 2015 interviews for nearly nine months before trial, a defense investigator also interviewed Ryan Thao before trial and, although Ryan Thao gave a description that excluded Chong as the shooter, Chong still elected not to call any of those witnesses at his trial. *Id.* ¶ 31.

Finally, "the State introduced strong evidence of [Chong Lee's] guilt at trial," with seven witnesses testifying that Chong Lee had confessed to the shooting. *Id.* ¶ 33.

Although Chong disagrees with the Wisconsin Court of Appeals' reasoning, he fails to show that it is contrary to or an unreasonable application of clearly established federal law or is unsupported by the evidence. § 2254(d). The only conceivable exculpatory statement Chong has identified was Mikey Thao's statement that he thought Chong was in jail on the night of the shooting. However, as the Wisconsin Court of Appeals pointed out, this statement was belied by the video evidence showing that Chong was present at the Luna Lounge on the night of the shooting. The video evidence overrides any potential exculpatory value that Mikey Thao's statement may have had. Chong has failed to cite any caselaw that would suggest that he was subjected to an unreasonable application of *Brady*, *Youngblood* or any other clearly established federal law or its progeny. The court therefore concludes that the state court's rejection of his due process claim was not contrary to, or an unreasonable application of such law and he is not entitled to relief on this claim.

### B. Absence of Transcripts

Chong Lee next claims that the absence of transcripts of some of the proceedings denied him the opportunity to meaningfully appeal, which compels a new trial. Pet'r's Br. in Supp. at 10. It is undoubtedly true that the absence of a transcript for the trial that results in a conviction can amount to the denial of a defendant's right to appeal in violation of his to due process of law. *Pope v. Taylor*, 100 F.4th 918, 920–21 (7th 2024) (holding that 28-year delay in resolving appeal resulting in loss of transcripts of trial deprived petitioner of his due process right to meaningful direct appeal). But only a small portion of the record bearing on one relatively minor evidentiary issue was apparently missing in this case. The trial court had previously ruled that Chong's statement

to the effect he could "beat this case" would not be admitted because it was not relevant and would only confuse the issue. Despite this ruling, one of the witnesses was asked to read a letter Chong has written to her following his arrest that included the statement. Chong's attorneys did not object, and the jury asked to see the letter during their deliberations.

There is no transcript of any discussion between the court and the parties regarding the jury's request, but the record shows the letter was provided to the jury. At the hearing on Chong's motion for postconviction relief, neither the attorneys, nor the trial court, could recall what occurred in chambers or what discussion had occurred. Chong contends that either his attorneys were ineffective in failing to object to the testimony and the letter going to the jury, or the trial court erred in reconsidering his earlier decision and allowing the letter to go to the jury.

An evidentiary ruling can infringe on a defendant's right to due process. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006). But due process is only "abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (cleaned up). The evidentiary issue Chong has raised does not rise to the level of a due process violation. Trial courts have substantial discretion in deciding whether questionable evidence is relevant and whether any probative value it may have is outweighed "by the danger of unfair prejudice confusion of the issues, or misleading the jury." *See* Wis. Stat. § 904.03. Considered in context, a ruling either way on the admissibility of the challenged statement would have been well within the trial court's discretion. *See* Dkt. No. 26-21 at 217:17–20:20. The admission of this evidence falls far short of depriving Chong of due process under clearly established federal law.

Nor did the absence of the transcript, which would have revealed whether his attorneys had objected or the trial court's reasoning for letting the letter go to the jury, deprive Chong of his right

14

to appeal.  The Wisconsin Court of Appeals noted that where the record does not disclose the trial

court's reasoning for an evidentiary ruling, it reviews the decision "independently" for an abuse

of discretion.  Dkt. No. 26-6, ¶ 59.  Thus, had Chong argued on appeal that the trial court abused

its discretion in allowing the letter to go to the jury, it would have decided that issue.  Likewise,

when the record fails to disclose whether counsel objected, the presumption is that counsel did not

and the question becomes whether the failure to do so amounted to deficient performance under

*Strickland v. Washington*, 468 U.S. 668, 687–91 (1984).  It thus follows, as the Court of Appeals

concluded, that Chong failed to show "a colorable need for the missing transcripts."  Dkt. No 26-

6, ¶ 60.

## C.  Ineffective Assistance of Trial Counsel

For the same reason and more, Chong falls short of establishing ineffective assistance of

counsel.  Chong initially asserted a claim of ineffective assistance of trial counsel based on trial

counsel's failure to object to hearsay statements, pursue a motion to suppress Chong Lee's

statements, and object to evidence that was previously ruled to be inadmissible from being heard

by the jury and reaching the jury during deliberations.  Dkt. No. 1 at 8.  In addition to failing to

establish deficient performance or prejudice, *see Strickland v. Washington*, 466 U.S. 668, 691–92

(1984), Chong has not properly exhausted, and thus abandoned, this ground for relief in his state

court proceedings.   Chong raised this issue in his postconviction motion but not on appeal.

*Compare* Dkt. No. 26-31 at 4–18 (discussion and denial of Chong's postconviction motion for

relief that his trial counsel rendered ineffective assistance) *with* Dkt. Nos. 26-3 & 26-5 (omitting

any claim of ineffective assistance of trial counsel).  Consequently, this ground for relief is not

exhausted and is not properly before this court.

15

Moreover, since filing his petition, Chong has also abandoned his ineffective assistance of counsel claim in this court. Although Chong Lee initially asserted this claim in his petition as his third ground for relief, discussion of it is entirely missing from his briefs. For purposes of habeas relief, failure to brief a ground for relief in the district court means that such a ground for relief is forfeited. *See Pole v. Randolph*, 570 F.3d 922, 937 (7th Cir. 2009).

## CONCLUSION

For the foregoing reasons, Chong Lee's petition for writ of habeas corpus (Dkt. No. 1) is **DENIED**. The Clerk is directed to enter judgment accordingly. A certificate of appealability will be **GRANTED** as to the issue of whether the destruction of evidence violated Chong Lee's right to due process, as reasonable jurists could conclude that Lee has made a substantial showing of the denial of a constitutional right. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Chong Lee is advised that the judgment entered by the Clerk is final. A dissatisfied party may appeal this court's decision to the United States Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment. *See* Fed. R. App. P. 3, 4.

**SO ORDERED** at Green Bay, Wisconsin this <u>6th</u> day of September, 2024.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

16

AO 450 (Rev. 5/85) Judgment in a Civil Case

# United States District Court
## EASTERN DISTRICT OF WISCONSIN

CHONG L. LEE,

                  Petitioner,

**JUDGMENT IN A CIVIL CASE**

     v.

Case No. 22-C-620

BRAD MLODZIK,

                  Respondent.

---

☐    **Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict

☒    **Decision by Court.** This action came before the Court for consideration.

      **IT IS HEREBY ORDERED AND ADJUDGED** that Chong Lee's petition for writ of habeas corpus is DENIED and the case is DISMISSED. A certificate of appealability will be GRANTED as to the issue of whether the destruction of evidence violated Chong Lee's right to due process, as reasonable jurists could conclude that Lee has made a substantial showing of the denial of a constitutional right.

                          Approved:  s/ William C. Griesbach
                                        WILLIAM C. GRIESBACH
                                        United States District Judge

Dated:  September 6, 2024

                                        GINA M. COLLETTI
                                        Clerk of Court

                                        s/ Mara A. VandenHeuvel
                                        (By) Deputy Clerk