No. 24-2647

_____

IN THE UNITED STATES COURT OF APPEALS

FOR THE SEVENTH CIRCUIT

CHONG L. LEE,

       Petitioner-Appellant,

       v.

BRADLEY MLODZIK,

       Respondent-Appellee.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN, CASE NO. 22-CV-620, THE
HONORABLE WILLIAM C. GRIESBACH, PRESIDING

**BRIEF OF RESPONDENT-APPELLEE**

JOSHUA L. KAUL
Attorney General of Wisconsin

JOHN W. KELLIS*
Assistant Attorney General
State Bar #1083400

Attorneys for Respondent-Appellee

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7081
(608) 294-2907 (Fax)
john.kellis@wisdoj.gov
*Counsel of Record

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ...................................................................1

ISSUES PRESENTED .........................................................................................1

STATEMENT OF THE CASE ............................................................................1

    I.    Police investigated a fatal shooting at the Luna Lounge. .............................................................................1

    II.    Police withheld and destroyed evidence of Watou's, Ryan's and Mikey's interviews to honor the men's wishes that they not be identified for fear of their own safety. ..................................................................5

    III.    Chong was convicted of first-degree intentional homicide and possession of a firearm as a felon at a trial where Chong declined to call Watou, Mikey, or Ryan to testify. ..................................................................7

    IV.    The trial court denied Chong's motion for postconviction relief, and the Wisconsin Court of Appeals affirmed his conviction and the order denying postconviction relief..........................................................8

    V.    The district court denied and dismissed Chong's petition for a writ of habeas corpus. ............................ 11

SUMMARY OF ARGUMENT ......................................................................... 12

STANDARD OF REVIEW............................................................................... 13

ARGUMENT .................................................................................................... 15

    I.    The Wisconsin Court of Appeals neither decided contrary to nor unreasonably applied *Trombetta* or *Youngblood* when it affirmed the remedy for an evidence-destruction due process violation. ................................ 15

Page

    A.    A criminal defendant's due process rights may be violated where the government destroys exculpatory evidence, but not all due process violations merit the harsh sanction of charge dismissal. ............................................................... 15

    B.    This Court has already decided that the Wisconsin courts' interpretation of *Youngblood* and *Trombetta*—which the Wisconsin Court of Appeals employed in Chong's case—is not contrary to clearly established federal law. ....................... 17

    C.    Fair-minded jurists could agree with the Wisconsin Court of Appeals that the trial court did not erroneously exercise its discretion when crafting a remedy for the violation of Chong's due process rights. ............................................... 20

II.    The Wisconsin Court of Appeals did not unreasonably apply *Brady* when it rejected Lee's evidence suppression due process claim, which is not properly before this Court on appeal. ......................................... 29

    A.    This Court should decline to review Chong's *Brady* claim for which neither the district court nor this Court issued a certificate of appealability. ...................................................... 29

    B.    A criminal defendant's due process rights may be violated where the government withholds exculpatory evidence in its possession. ............................... 30

    C.    Fair-minded jurists could agree with the Wisconsin Court of Appeals that the 2013 interview evidence was not favorable to Chong because it was not exculpatory. ......................................... 31

    D.    The State suppressed the 2013 interview evidence. ............................................................. 36

Page

E.    Fair-minded jurists could agree with the Wisconsin Court of Appeals that Chong was not prejudiced by suppression of the 2013 interview evidence. ............................................................... 37

F.    Chong's requested relief in connection with his due process evidence-suppression claim is illogical. ............................................................................. 44

CONCLUSION ............................................................................. 45

## TABLE OF AUTHORITIES

**Cases**

*Arizona v. Youngblood,*
   488 U.S. 51 (1988) ................................................................ 1, 16, 21

*Badelle v. Correll,*
   452 F.3d 648 (7th Cir. 2006) .......................................................... 14

*Bell v. Cone,*
   535 U.S. 685 (2002) ................................................................ 14, 17

*Brady v. Maryland,*
   373 U.S. 83 (1963) ................................................................... 1, 30

*California v. Trombetta,*
   467 U.S. 479 (1984) ......................................................... 1, *passim*

*Davis v. Ayala,*
   576 U.S. 257 (2015) ..................................................................... 14

*Glebe v. Frost,*
   574 U.S. 21 (2014) ....................................................................... 18

*Harrington v. Richter,*
   562 U.S. 86 (2011) .......................................................... 14, *passim*

*Jones v. Basinger,*
   635 F.3d 1030 (7th Cir. 2011) ....................................................... 13

Page

*Kidd v. Gomez*,
   2 F.4th 677 (7th Cir. 2021) ............................................................. 13

*McCarthy v. Pollard*,
   656 F.3d 478 (7th Cir. 2011) ...................................................... 17, 18

*McNeill v. Bagley*,
   10 F.4th 588 (6th Cir. 2021) ............................................................ 34

*Nichols v. Wiersma*,
   108 F.4th 545 (7th Cir. 2024) .......................................................... 18

*Ouska v. Cahill-Masching*,
   246 F.3d 1036 (7th Cir. 2001) ......................................................... 29

*Rittenhouse v. Battles*,
   263 F.3d 689 (7th Cir. 2001) ....................................................... 29, 30

*Searcy v. Jaimet*,
   332 F.3d 1081 (7th Cir. 2003) ......................................................... 13

*State v. Amundson*,
   69 Wis. 2d 554, 230 N.W.2d 775 (1975) ...................................... 10, 23

*State v. Harris*,
   2004 WI 64, 272 Wis. 2d 80, 680 N.W.2d 737 ................................. 38

*State v. Wayerski*,
   2019 WI 11, 385 Wis. 2d 344, 922 N.W.2d 468 ......................... 10, 38

*Stern v. Meisner*,
   812 F.3d 606 (7th Cir. 2016) ........................................................... 13

*Strickler v. Greene*,
   527 U.S. 263 (1999) .................................................................... 31, 35

*United States v. Agurs*,
   427 U.S. 97 (1976) ...................................................................... 42, 43

*United States v. Bagley*,
   473 U.S. 667 (1985) ......................................................................... 31

Page

*United States v. Bryant,*
    439 F.2d 642 (D.C. Cir. 1971) .......................................................... 24

*United States v. Vega,*
    826 F.3d 514 (D.C. Cir. 2016) .......................................................... 24

*Williams v. Taylor,*
    529 U.S. 362 (2000) .......................................................... 14

*Yarborough v. Alvarado,*
    541 U.S. 652 (2004) .......................................................... 15

**Statutes**

28 U.S.C. § 2254(a) .......................................................... 13

28 U.S.C. § 2254(d)(1)–(2) .......................................................... 14

## JURISDICTIONAL STATEMENT

Petitioner-Appellant Chong L. Lee's jurisdictional statement is complete and correct.

## ISSUES PRESENTED

1.     Did the Wisconsin Court of Appeals decide contrary to or unreasonably apply *California v. Trombetta*, 467 U.S. 479 (1984), or *Arizona v. Youngblood*, 488 U.S. 51 (1988), when it held that the trial court did not erroneously exercise its discretion when it declined to dismiss Chong Lee's homicide charge as a remedy for the State's destruction of potentially exculpatory evidence and instead imposed a less severe sanction prohibiting the State—but not Chong—from calling certain witnesses at his trial?

2.     Given that neither the district court nor this Court granted a certificate of appealability on the issue, should this Court review Chong Lee's claim that the Wisconsin Court of Appeals decided contrary to or unreasonably applied *Brady v. Maryland*, 373 U.S. 83 (1963), when it held that Chong Lee's due process rights were not violated by the nondisclosure of three witness interviews? If so, is he entitled to habeas corpus relief on that basis?

## STATEMENT OF THE CASE

## I.     Police investigated a fatal shooting at the Luna Lounge.

In the early morning hours of December 8, 2013, police responded to the Luna Lounge to investigate a shooting. (Additional App. 4.) Officers arrived to

find Joshua Richards lying on the floor by the club entrance with a fatal gunshot wound to his head. (Additional App. 4.)[1]

Seeking to identify Richards's killer, police reviewed surveillance footage to discover that three men—Joe Thor, Paul Lee, and Phong Lee—left the Luna Lounge seconds after the shooting.[2] (Additional App. 4.) The same cameras captured other men, including Paul's brother, Chong, leaving the club around the same time. (Additional App. 4–5.) Days later, detectives interviewed Ryan Thao, Mikey Thao, and Watou Lee. (Dkt. 26-12:31, 35–37.) While the three described the suspect's clothing, physical characteristics, and travel path through the club, none identified Chong as the shooter. (Dkt. 26-12:37–39.)

On the same day police interviewed Ryan, Mikey, and Watou, Detective Neal Rabas contacted another shooting suspect who was captured on video: Paul. (Dkt. 26-25:153–54.) Police were concerned Paul was the shooter because he was captured on video, in the shooting area, holding an item that appeared to be a gun. (Dkt. 26-25:137–38.) Given that information, Detective Rabas interviewed Paul at his workplace, where Paul admitted he tried to punch

---

[1] All citations to Chong's appellate brief, his required short appendix, and his additional appendix refer to the electronic page numbers of the filed documents, rather than the page numbers listed on the documents themselves.

[2] For ease of reading, to distinguish between several relevant individuals who share the same surname, Respondent-Appellee refers to Petitioner-Appellant Chong Lee as "Chong," to Paul Lee as "Paul," to Watou Lee as "Watou," to Ryan Thao as "Ryan," and to Mikey Thao as "Mikey." Also, while Warden Bradley Mlodzik is the named Respondent-Appellee in this action, this brief refers to Respondent-Appellee as "the State" since the State of Wisconsin is the real party in interest.

Richards seconds before the shooting but denied he was either the shooter or even armed, instead claiming that the item seen in his hand on surveillance video was just an electronic cigarette. (Dkt. 26-25:82–83, 87–88.)

Having worked in law enforcement for nearly 27 years, Detective Rabas was trained on various interview tactics, some of which incorporated the use of exaggerations or outright lies to convince the interviewee to provide more information. (Dkt. 26-25:12, 15, 23–24.) He acknowledged that he enlisted some of those tactics during Paul's interview when he told Paul that five people said he was the one who shot Richards, even though he knew that was untrue and that not even one person had told police that Paul was responsible. (Dkt. 26-25:155–56.) Still, Paul remained steadfast that he was not the shooter and did not possess a gun, at times directing the detective to review surveillance footage to support his defense. (Dkt. 26-25:84–85, 88, 90.) Despite that story, police arrested Paul for Richards's murder. (Dkt. 26-15:30.)

While Paul was detained for questioning, police continued to pursue other leads to learn that Chong had confided in several others that he was the one responsible for the Luna Lounge shooting. (Additional App. 5.) In total, police identified eight people who claimed that Chong confessed to the shooting in the ensuing hours, days, or weeks:

(1) Phong Lee, who spoke with police on December 12, 2013, and claimed that he went to Joe Thor's residence after the shooting, that Chong arrived within the hour, and that Chong said that "he popped a guy," (Dkt. 26-26:22);

(2) Via Thao, who claimed that he met with Chong on the day of the shooting and heard Chong mention a fight that occurred in downtown Appleton in which he pulled out a gun and shot a guy, (Dkt. 26-19:34, 37, 41–42);

(3) Peter Moua, who claimed that Chong spoke with him on the evening of the shooting, asked if he knew anything "about Luna," and then told him that he "got him," (Dkt. 26-19:60, 67);

(4) Stephanie Thao, who claimed that, while dining with Chong and her sister on the day after the shooting, Chong both mentioned the Luna Lounge shooting and disclosed that he shot in the head a person who was "going to swing at his brother," Paul, (Dkt. 26-21:197–98);

(5) Melanie Thao, Stephanie's sister, who claimed that she dined with Chong and Stephanie twice in the week following the shooting and that Chong admitted during both meals that "he shot the guy" at the Luna Lounge, (Dkt. 26-21:142–43, 148–49);

(6) Kong Vang, who claimed that Chong spoke with him at a gathering with friends to watch a football game in December 2013 and told him, while in the presence of Via Thao, that he had "shot somebody" to protect his brother, (Dkt. 26-19:71–74);

(7) Joe Thor, who had known Chong since they were kids, who saw Paul attempt to punch Richards, watched Richards cock his fist back in response, observed a flash of light accompanied by an audible bang, looked up to see Richards lying on the floor, and spoke with Chong later in the night, when Chong arrived at his home and told him that he "did the shooting at Luna Lounge," (Dkt. 26-23:16–20, 25, 28); and

 (8) Paul also eventually disclosed to police that Chong was the person who shot Richards, (Dkt. 26-23:178).

Police subsequently arrested Chong for Richards's murder, and the State subsequently charged him with first-degree intentional homicide with the use of a dangerous weapon, possession of a firearm by a felon, and four counts of felony intimidation of a witness. (Additional App. 4.)

## II.    Police withheld and destroyed evidence of Watou's, Ryan's and Mikey's interviews to honor the men's wishes that they not be identified for fear of their own safety.

During their December 2013 interviews, Watou, Mikey, and Ryan each expressed concerns about their safety, asked not to be identified, and voiced an overarching desire not to get involved in the case. (Dkt. 26-12:44.) Their wishes were honored; the State did not disclose that the three men were interviewed, and police deleted the recordings of their interviews after retaining them for seven or eight months. (Dkt. 26-12:31–32, 35–37, 57–58; 26-13:53.)

Despite efforts to protect the identity of the three men, police turned over to Chong's lawyers a picture of a whiteboard bearing Watou's, Mikey's, and Ryan's names and photographs. (Dkt. 26-12:60, 63–64; 26-13:54.) Realizing their mistake, police contacted the three men to explain that their identities had been inadvertently exposed and to request that the men reconsider their unwillingness to serve as witnesses in the case. (Dkt. 26-12:35, 64, 71–74; 26-14:37, 40.) Police reinterviewed Watou, Mikey, and Ryan in April 2015 and turned reports and recordings of those interviews over to the defense, but the substance of those interviews revealed to defense counsel that police had previously interviewed all three men. (Dkt. 26-12:26, 30, 56.)

Given that revelation, Chong's attorneys moved the court to compel the State to turn over discovery relating to those prior interviews, only to find that police had deleted the recordings and were unable to recover them. (Dkt. 26-12:26, 75; 26-13:52–53; 26-14:6.)

Chong subsequently moved the trial court to dismiss his homicide charge as a sanction for police deleting the December 2013 interviews or, alternatively, to prevent the State from eliciting any incriminating testimony from Watou, Mikey, or Ryan at his trial. (Dkt. 26-16:2–3.)

The trial court granted Chong's motion but declined to dismiss his case, instead tailoring a less severe sanction that barred the State from calling Watou, Mikey, or Ryan as trial witnesses but allowed Chong to call any or all

6

of the three men as witnesses, if he desired. (Dkt. 26-16:10–13.) Though the court found that the 2013 interview evidence from Watou, Mikey, and Ryan was potentially exculpatory and that police had destroyed that evidence in bad faith, it still identified several mitigating factors leading it to conclude that charge dismissal was "unreasonable in light of the facts and circumstances associated with this case." (Dkt. 26-16:11–14.) Specifically, the court observed that despite destroying evidence, the choice to do so was "purely motivated" by the desire "to protect the witnesses" and not "in an effort to usurp the defendant's right to a fair trial." (Dkt. 26-16:12–13.)

Finally, the court clarified that, in the event that Chong argued at trial that the Appleton police destroyed evidence to lead the jury to believe police had done "something improper, then that w[ould] open the door to allow" police witnesses to explain the reason the evidence was destroyed was that Watou, Mikey, and Ryan "were afraid and they didn't want that information released." (Dkt. 26-16:23–24.) The court also confirmed defense counsel's understanding that even if that occurred, this still would not allow for the admission of "all the underlying statements made by those witnesses" (Dkt. 26-16:24–25.)

## III.   Chong was convicted of first-degree intentional homicide and possession of a firearm as a felon at a trial where Chong declined to call Watou, Mikey, or Ryan to testify.

Chong proceeded to an 11-day trial where the jury heard from more than 40 witnesses. (Dkt. 26-17; 26-18; 26-19; 26-20; 26-21; 26-22; 26-23; 26-24; 26-

25; 26-26; 26-27; 26-28.) As noted above, the jury learned that Chong confessed to the Luna Lounge shooting to no fewer than eight people in the hours, days, or weeks after the shooting. In addition, the jury heard that Chong was captured on video entering the Luna Lounge at 1:12 a.m. and leaving the bar at 1:50 a.m., just seven seconds after the shooting. (Dkt. 26-25:36, 52.)

Chong did not call Watou, Mikey, or Ryan to testify at trial.

The jury found Chong guilty of first-degree intentional homicide, being a felon in possession of a firearm, and two counts of witness intimidation. (Dkt. 26-28:3–5.)

## IV.  The trial court denied Chong's motion for postconviction relief, and the Wisconsin Court of Appeals affirmed his conviction and the order denying postconviction relief.

Chong appealed, arguing, inter alia, that his due process rights were violated under *Brady* and *Youngblood* when police withheld—and later destroyed—the recordings and notes from the 2013 interviews of Watou, Mikey, and Watou.[3] (Additional App. 10.)

The Wisconsin Court of Appeals rejected his arguments and affirmed his judgment of conviction and the order denying postconviction relief. (Additional App. 10–27.)

---

[3] The State refers to the withheld and destroyed evidence, which consisted of the interview recordings, drawn maps, and the detectives' notes, if any, collectively, as the "2013 interview evidence."

The court first determined that Chong's due process rights under *Brady* were not violated by the nondisclosure of the 2013 interview evidence because Chong "ha[d] not shown that those interviews were either favorable to him or material to the determination of his guilt." (Additional App. 10–11.) Supporting that conclusion, the court concluded that the 2013 interview evidence was not favorable to Chong as it was not exculpatory. (Additional App. 11–13.) And the court separately determined that the 2013 interview evidence was not material because it was not exculpatory, it did not affect his trial preparation or presentation, and the State's evidence against him was strong. (Additional App. 14–16.)

The court then determined that, although Chong's due process rights under *Youngblood* were violated by the destruction of the 2013 interview evidence, the trial court properly exercised it discretion in crafting a remedy short of charge dismissal. (Additional App. 18–24.) Supporting that conclusion, the court held that Chong not only failed to establish that the 2013 interview evidence had exculpatory value that was apparent when it was destroyed, but the evidence was not of such a nature that Chong would not be able to obtain comparable evidence by other reasonably available means. (Additional App. 18–19.) The court went on to explain that the 2013 interview evidence, though not apparently exculpatory, was at least potentially exculpatory and that,

based on the trial court's factual findings, police acted in bad faith by destroying the evidence. (Additional App. 19–20.)

Despite holding that Chong's due process rights were violated by the destruction of that evidence, the court determined that the trial court did not erroneously exercise its discretion in declining to dismiss Chong's homicide charge and instead imposing a lesser sanction of barring the State—but not Chong—from calling Watou, Mikey, and Ryan to testify at trial. (Additional App. 20–24.) Supporting that conclusion, the court observed that, under Wisconsin law, courts were to consider three factors when deciding "whether dismissal is warranted as a sanction for the State's destruction of evidence": "(1) the degree of negligence or bad faith by the government; (2) the importance of the evidence lost; and (3) the other evidence of the defendant's guilt adduced at trial." (Additional App. 21 (citing *State v. Amundson*, 69 Wis. 2d 554, 230 N.W.2d 775, 788–89 (1975), *overruled on other grounds by State v. Wayerski*, 2019 WI 11, 385 Wis. 2d 344, 922 N.W.2d 468).)

The court concluded that "each of these factors support[ed] the circuit court's discretionary decision that suppression, rather than dismissal, was the appropriate remedy for the due process violation." (Additional App. 21–22.) It first recognized that, although police acted in bad faith in destroying the 2013 interview evidence, there were mitigating factors present, namely that police destroyed the evidence, in part, to protect the witnesses' identities and that the

10

destruction was not done to "usurp [Chong]'s right to a fair trial." (Additional App. 22.) It then held that, based on its holding that the destroyed evidence was neither exculpatory nor material to a jury's determination of guilt, it was unable to "conclude that the recordings of the December 2013 interviews were particularly important to Chong's defense." (Additional App. 22–23.) Finally, ending with a review of the evidence presented at Chong's trial, the court reiterated that the State's evidence was strong, with seven witnesses claiming that Chong confessed to the homicide. (Additional App. 23.)

Chong petitioned the Wisconsin Supreme Court for discretionary review, which the court denied. (Dkt. 26-7; 26-9.) Chong then petitioned the Supreme Court for certiorari review, which the Court denied. (Dkt. 26-10; 26-11.)

## V.   The district court denied and dismissed Chong's petition for a writ of habeas corpus.

Chong filed a pro se petition for a writ of habeas corpus in the United States District Court for the Eastern District of Wisconsin. (Dkt. 1.) In his Petition and subsequent merits brief, he renewed his argument that police violated his due process rights by withholding and subsequently destroying the 2013 interview evidence. (Dkt. 1:6–8; 31:2–10.)

The district court denied Chong's Petition, concluding that the Wisconsin Court of Appeals neither decided contrary to nor unreasonably applied clearly established Supreme Court precedent when it rejected his dual due process

claims. (Short App. 77–82.) Specifically, it noted that "Chong has failed to cite any caselaw that would suggest that he was subjected to an unreasonable application of *Brady*, *Youngblood*[,] or any other clearly established federal law or its progeny," leading it to "conclude[ ] that the state court's rejection of his due process claim was not contrary to, or an unreasonable application of such law and he is not entitled to relief on this claim." (Short App. 82.)

Despite that holding, the district court granted Chong a certificate of appealability. (Short App. 85.)

## SUMMARY OF ARGUMENT

The nature of the claims Chong raised in his federal habeas corpus petition understandably may give this Court pause. That police withheld and later destroyed recordings of witness interviews conducted as part of a homicide investigation sounds egregious. But this Court is not tasked with deciding whether there were better ways for police to protect three witnesses who asked not to be identified due to grave concerns about their safety. Rather, this Court must decide only whether the Wisconsin Court of Appeals decision, which held that the nondisclosure of the evidence did not violate Lee's due process rights and that the trial court properly exercised discretion in crafting an appropriate sanction for the destruction of the same evidence, was either contrary to or involved an unreasonable application of Supreme Court precedent. The district court correctly decided it was not. Whether or not it

elects to review Chong's evidence-suppression claim for which no certificate of appealability has issued, this Court should affirm the district court's decision.

## STANDARD OF REVIEW

This Court "review[s] the district court's denial of a petition for writ of habeas corpus *de novo*." *Kidd v. Gomez*, 2 F.4th 677, 679 (7th Cir. 2021). When conducting that assessment, this Court reviews only "the decision of the last state court to rule on the merits" of the petitioner's habeas corpus claim(s). *Stern v. Meisner*, 812 F.3d 606, 609 (7th Cir. 2016) (citation omitted). In Chong's case, that was the Wisconsin Court of Appeals. (Additional App. 3–27; Dkt. 26-9.)

"The provisions of the Antiterrorism and Effective Death Penalty Act ('AEDPA') . . . significantly constrain any federal court review of a state court conviction." *Searcy v. Jaimet*, 332 F.3d 1081, 1087 (7th Cir. 2003). To obtain relief under AEDPA, Chong must show that he is "in custody in violation of the Constitution or laws or treaties of the United States." *Jones v. Basinger*, 635 F.3d 1030, 1040 (7th Cir. 2011) (quoting 28 U.S.C. § 2254(a)). To meet that requirement, he must satisfy 28 U.S.C. § 2254(d) by establishing that the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in

light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A state court decision is "contrary to" federal law if the state court applies a rule different from the governing law as set forth in Supreme Court cases, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). And a state court's application of federal law is "unreasonable" if it "correctly identifies the [controlling] legal principle from [Supreme Court] decisions but unreasonably applies it to the facts of the particular case." *Bell v. Cone*, 535 U.S. 685, 694 (2002). As this Court has explained, "an unreasonable state court decision is one 'lying well outside the boundaries of permissible differences of opinion,' or one that is 'at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary' as to be unreasonable." *Badelle v. Correll*, 452 F.3d 648, 655 (7th Cir. 2006) (citations omitted).

The standard under § 2254(d) "was meant to be" difficult to meet. *Harrington v. Richter*, 562 U.S. 86, 102 (2011). It is "highly deferential" to the state court's decision. *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (citing *Richter*, 562 U.S. at 103). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at

102–03 (citation omitted). A decision is unreasonable and warrants a writ of habeas corpus only if it "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Simply stated, § 2254(d) allows habeas relief only "in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* at 102.

## ARGUMENT

**I.    The Wisconsin Court of Appeals neither decided contrary to nor unreasonably applied *Trombetta* or *Youngblood* when it affirmed the remedy for an evidence-destruction due process violation.**

**A.    A criminal defendant's due process rights may be violated where the government destroys exculpatory evidence, but not all due process violations merit the harsh sanction of charge dismissal.**

Two United States Supreme Court cases address the criteria that courts must apply to assess when the State's failure to preserve evidence amounts to a due process violation: *Trombetta* and *Youngblood*. The former provides that due process is violated where the defendant shows that the State lost or destroyed "evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488. To meet this standard, the lost

15

evidence must "possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id.* at 489. And the latter provides that due process is violated where the defendant shows that the State lost or destroyed evidence that is potentially exculpatory and that the evidence was lost or destroyed in bad faith. *Youngblood*, 488 U.S. at 57–58.

Where a due process violation occurs due to evidence destruction, the Supreme Court recognized that trial courts maintain discretion in fashioning a remedy for that violation, whether it be imposing the harshest sanction of outright barring the defendant's continued criminal prosecution or a less severe sanction, such as evidence suppression. *Trombetta*, 467 U.S. at 487. Inherent in the recognition that a court may impose a lesser sanction is the acknowledgment that not all due process violations resulting from improper evidence destruction merit case dismissal, and neither *Trombetta* nor *Youngblood* prescribed any rule or even set any guidelines governing when case dismissal is required over a lesser sanction.

16

**B.    This Court has already decided that the Wisconsin courts' interpretation of *Youngblood* and *Trombetta*—which the Wisconsin Court of Appeals employed in Chong's case—is not contrary to clearly established federal law.**

In an attempt to circumvent the deference this Court owes to the state court decision under 28 U.S.C. § 2254(d), Chong argues first that "[t]he Wisconsin Court of Appeals applied *Youngblood* and *Trombetta* contrary to clearly established law." (Chong's Br. 41–42.) Specifically, he maintains that the Wisconsin Court of Appeals applied what he labels "'a rule different from the governing law set forth in [Supreme Court] cases,' specifically *Trombetta* and *Youngblood*." (Chong's Br. 42 (quoting *Bell*, 535 U.S. at 694).) In support of his assertion that Wisconsin courts have—and continue to—apply a different rule contrary to *Trombetta* and *Youngblood*, he cites *McCarthy v. Pollard*, 656 F.3d 478, 484–85 (7th Cir. 2011), where this Court noted that it interprets *Trombetta* and *Youngblood* differently than Wisconsin courts. (Chong's Br. 39–40.)

Chong is correct that this Court interprets *Trombetta* and *Youngblood* differently than Wisconsin courts. As *McCarthy* summarized,

> According to Wisconsin courts, these cases stand for the proposition that a defendant's due process rights are violated if the police (1) failed to preserve "apparently" exculpatory evidence, leaving the defendant with no ability to obtain comparable evidence by any other reasonable means (with this portion of rule deriving from *Trombetta*); or (2) failed to preserve "potentially" exculpatory evidence in bad faith (with this portion of the rule deriving from *Youngblood*).

17

*McCarthy*, 656 F.3d at 484. Conversely, this Court explained how it did not view *Trombetta* and *Youngblood* to create two separate pathways to proving a due process violation resulting from evidence destruction and instead viewed the two cases to support one overarching rule:

> We instead read both cases to stand for the same proposition: the destruction of potentially exculpatory evidence violates the defendant's right to due process if (1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means.

*Id*.

The fact that this Court interprets *Trombetta* and *Youngblood* differently than Wisconsin courts, however, does not mean that the Wisconsin Court of Appeals decided contrary to federal law in Chong's case. As proof of that, this Court need look no further than its own recent decision in *Nichols v. Wiersma*, 108 F.4th 545 (7th Cir. 2024). There, this Court observed that the mere fact it interprets *Trombetta* and *Youngblood* differently does not mean Wisconsin courts decided contrary to federal law by employing a different interpretation of those same cases. *Nichols*, 108 F.4th at 554. This Court explained why: 28 U.S.C. § 2254(d) "makes the decisions of the Supreme Court of the United States the ultimate touchstone. Lower federal courts may not grant habeas relief simply because they read those decisions differently than state courts do." *Id*.; *see also Glebe v. Frost*, 574 U.S. 21, 24 (2014) (recognizing that federal

circuit precedent does not constitute "clearly established Federal law" for purposes of habeas corpus proceedings).

In Chong's case, the Wisconsin Court of Appeals employed the same interpretation of *Youngblood* and *Trombetta* that it did in *Nichols*, which led it to conclude that Chong suffered a violation of his due process rights when the police destroyed the 2013 interview evidence. (Additional App. 18–20.) Indeed, the court even identified, and expressly referred to, *Youngblood* as guiding its analysis concerning whether the destruction of the 2013 interview evidence violated Chong's due process rights. (Additional App. 18.) From there, the court then assessed whether the sanction imposed for the violation—barring the State from calling Watou, Mikey, and Ryan as witnesses at Chong's trial while allowing Chong to present any of those witnesses if he so wished—constituted an erroneous exercise of discretion. (Additional App. 20–24.)

Notably, Chong does not argue that this part of the Wisconsin Court of Appeals's decision—the remedy for a due process violation—was contrary to *Youngblood* or *Trombetta.* Put another way, he does not argue that *Youngblood* or *Trombetta* establish a rule demanding a specific remedy for an evidence-destruction due process claim or that the Wisconsin Court of Appeals failed to apply that rule in his case. Rather, he merely argues that any sanction short of dismissing his case and barring his continued prosecution constituted an

unreasonable application of *Trombetta* and *Youngblood*, (Chong's Br. 48–53), an argument the State addresses below. *See infra* pp. 20–28.

In sum, Chong's argument that the Wisconsin Court of Appeals decided contrary to *Trombetta* and *Youngblood* is foreclosed by this Court's decision in *Nichols*. He is not entitled to federal habeas corpus relief simply because the Wisconsin Court of Appeals continues to interpret *Trombetta* and *Youngblood* differently than this Court.

> **C.    Fair-minded jurists could agree with the Wisconsin Court of Appeals that the trial court did not erroneously exercise its discretion when crafting a remedy for the violation of Chong's due process rights.**

To evade AEDPA deference, Chong also argues that the Wisconsin Court of Appeals unreasonably applied *Youngblood* and *Trombetta* when it affirmed as a proper exercise of discretion the trial court's sanction for the violation of Chong's due process rights. (Chong's Br. 42–53.) That sanction barred the State—but not Chong—from calling Watou, Mikey, and Ryan as witnesses at his trial. (Chong's Br. 42–53.)

Before addressing that argument, it's important to narrow the issue before this Court. Though Chong dedicates significant effort to proving that he met all three elements under *Trombetta* and *Youngblood*—namely that police destroyed the 2013 interview evidence in bad faith, that the evidence's exculpatory value was apparent to the State upon its destruction, and that he

cannot obtain comparable evidence—the relevant question is not whether his due process rights were violated by the destruction of evidence. The Wisconsin Court of Appeals agreed that they were, (Additional App. 24), and the State has not argued otherwise in this federal habeas corpus action.

Rather, the only issue before this Court is whether the Wisconsin Court of Appeals, despite declaring Chong's due process rights were violated by the destruction of the 2013 interview evidence, unreasonably applied *Trombetta* or *Youngblood* when it affirmed the trial court's sanction for the due process violation. It did not, and none of Chong's counterarguments should persuade otherwise.

Again, *Youngblood* said nothing about the appropriate remedy that a court must or even should order where a defendant's due process rights are violated due to the government's destruction of evidence. Because the Court determined that no due process violation occurred, it had no reason to weigh in on available remedies or offer guidance on when evidence suppression would be an adequate remedy instead of case dismissal. *See Youngblood*, 488 U.S. at 57–59. And *Trombetta*'s discussion of remedies for an evidence-destruction due process violation consisted of just one sentence, affirming that courts must choose between evidence suppression or barring a defendant's prosecution, altogether. *Trombetta*, 467 U.S. at 487. Together, neither *Youngblood* nor *Trombetta* really offer meaningful guidance—much less a specific rule—on how

21

to fashion a remedy for an evidence-destruction due process violation, which may explain why the Wisconsin Court of Appeals resorted to state court precedent, rather than any Supreme Court authority, when assessing whether the remedy imposed in Chong's case was suitable. (Additional App. 21–22.)

Given the lack of specific rule or even general guidance, Chong faces an uphill battle to disturb his conviction in this federal habeas corpus action. This holds true because it's not enough for Chong to convince this Court that the remedy imposed by the trial court in his case and then upheld on appeal was inadequate. Rather, he must establish that the Wisconsin Court of Appeals' decision affirming a choice of remedy short of dismissal for that due process violation was not just wrong but "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

Chong has fallen far short of that demanding requirement. Here, the Wisconsin Court of Appeals identified and applied multiple relevant factors leading it to conclude that "the circuit court's discretionary decision that suppression, rather than dismissal, was the appropriate remedy for the due process violation." (Additional App. 22–23.) It first observed that "the degree of negligence or bad faith" by police "weigh[ed] against dismissal," recounting multiple mitigating factors surrounding the destruction of the 2013 interview evidence, namely that police destroyed the evidence to protect the witnesses'

identities, that doing so did not necessarily involve an agency policy violation, and that police did not act "in an effort to usurp [Chong's] right to a fair trial." (Additional App. 22.) It also noted the destroyed evidence's lack of importance, recounting that Chong failed to show that the evidence was exculpatory or material to the jury's determination of his guilt, that police reinterviewed the witnesses before Chong's trial and provided recordings to the defense, and that Chong could have called the witnesses to testify at trial. (Additional App. 22–23.) And, finally, the court recognized the strong evidence of Chong's guilt, particularly given his *seven* confessions to the charged homicide offense. (Additional App. 23.)

Moreover, the court also addressed and rejected Chong's complaint that the chosen remedy was detrimental to his case. (Additional App. 23.) The court reiterated that the circuit court's order barring the State from calling Watou, Mikey, or Ryan at trial did not apply to Chong, who could have presented those witnesses if he felt that they could have helped his defense. (Additional App. 23.) And the court recognized that Chong failed to raise any contemporaneous objection to the remedy, where he could have argued that it was harmful to his defense. (Additional App. 23–24.)

That was a reasonable assessment based on the facts before it. Notably, while the court drew the above-referenced considerations from the Wisconsin Supreme Court's decision in *Amundson*, 230 N.W.2d 775, (Additional App. 23–

23

24), *Amundson* itself devised those factors from *United States v. Bryant*, 439 F.2d 642 (D.C. Cir. 1971), *abrogated on other grounds by United States v. Vega*, 826 F.3d 514 (D.C. Cir. 2016). In other words, the framework that the Wisconsin Court of Appeals used in Chong's case is not new nor novel, and here, it served as an adequate sanction.

Chong disagrees, but none of his arguments establish that the Wisconsin Court of Appeals' analysis was not just wrong but so patently unreasonable so as to merit habeas corpus relief. For starters, he complains of the difficulty in crafting a remedy because the prejudice caused by evidence destruction—as opposed to nondisclosure—is permanent. (Chong's Br. 48–49.) But that's true for all evidence destruction cases, yet the Supreme Court has never proclaimed that case dismissal is the only suitable remedy for such a due process violation, nor has it labeled case dismissal even a preferred or presumptive remedy.

Moreover, as a practical matter, if evidence suppression were truly such a harmful alternative to charge dismissal, why did he ask for it in his trial court motion? While he may not have requested the precise remedy imposed in the case—he requested that the court suppress "any in court identification of Chong" by Watou, Mikey, and Ryan, as well as any testimony from those witnesses linking him to the homicide, whereas the court simply barred the State, but not Chong, from calling those three witnesses at trial, (Additional

App. 23)—he still acquiesced to an alternative remedy, revealing that even he believed alternative remedies short of charge dismissal could be reasonable.

Additionally, Chong misrepresents the trial court's sanction in order to challenge its reasonableness. In explaining the restrictions on the imposed sanction, the trial court clarified that the State would be prohibited from calling Watou, Mikey, or Ryan as witnesses at Chong's trial but that Chong could call any of those three men as witnesses if he wished. (Additional App. 34, 37–38.) The court went on to further clarify that if Chong chose to delve into the issue of police's destruction of the 2013 interview evidence to argue that police engaged in improper conduct, that could "potentially open the door" to allowing police witnesses to explain why the evidence was destroyed. (Additional App. 37–40.)

Chong interprets that clarification to mean that if he chose to call Watou, Mikey, or Ryan as "witnesses for something, doing so would open the door to *all* issues." (Chong's Br. 49.) But again, that's not what the trial court said. It did not suggest that calling Watou, Mikey, or Ryan as witnesses would open the door to anything. Rather, the court cautioned that eliciting evidence about destruction of the 2013 interview evidence in attempts to argue that police had engaged in misconduct would allow the State to present evidence about why the officers destroyed the 2013 interview evidence.

In other words, Chong could have called Watou, Mikey, and Ryan to testify at his trial and could have asked all three men if they were present during the shooting. Because none of the three men had identified him as the shooter up to that point, he could have asked questions in hopes to convince the jury that the physical descriptions they provided did not match his appearance on the night in question. If any of the men changed their stories to claim that he was the shooter, Chong could impeach them with their prior statements by calling as witnesses the officers or detectives who previously interviewed them to inform the jury that the men were either lying at trial or lying during their previous statements. And Chong could do all of that without ever eliciting any testimony about the destruction of the 2013 interview evidence such that he would not open the door to any additional evidence. He faced no proverbial "Hobson's choice" as he now suggests. (Chong's Br. 49.) He could have called all three men as witnesses, knowing that they had claimed to have witnessed the shooting but did not identify him as the shooter, and he could have impeached their testimony if they changed their story to his detriment.

Chong also could have called Watou, Mikey, and Ryan to testify to ask whether they saw Paul at the Luna Lounge on the night of the shooting or saw anything to suggest that Paul—not Chong—was the shooter. Given that Paul was captured on video fleeing from the establishment right after the shooting,

holding what appeared to be a gun in his hand, and later admitted to police that he had tried to punch the victim just seconds before he was shot, Chong could have also used the three witnesses to possibly convince the jury that it was Paul—and not him—who fatally shot the victim.[4] And again, he could have done that without mentioning the destruction of the 2013 interview evidence and, therefore, not opening the door to other evidence.

In short, Chong suffered no prejudice from the sanction that the trial court imposed upon the State for violating his due process rights by destroying the 2013 interview evidence. As the Wisconsin Court of Appeals aptly noted, nothing prevented Chong from calling Watou, Mikey, or Ryan to testify in his own defense, and as explained above, doing so would not have opened the door to any harmful evidence, or at least none he could not sufficiently challenge by impeaching the same witnesses with their prior inconsistent statements.

Finally, in a last-ditch effort to convince this Court that the imposed sanction was unreasonable, Chong offers a wealth of authority in which federal courts have upheld the use of an "adverse inference instruction" as a remedy for an evidence-destruction due process violation. (Chong's Br. 51–52.) But

---

[4] Chong's repeated intimation that Watou, Mikey, and Ryan must have said something to police during their initial interviews to lead police to arrest Paul is a red herring. Police arrested Paul because he was observed on surveillance video fleeing the Luna Lounge right after the shooting, holding what appeared to be a gun, and he admitted during a pre-arrest interview that he was involved in a physical altercation with the victim just seconds before the shooting. *See infra* pp. 38–39.

Chong did not request that remedy, and he cannot now fault the trial court for declining to impose, or the Wisconsin Court of Appeals for declining to consider, such an alternative remedy. And even if he had, that still would not entitle him to federal habeas corpus relief since he has not and cannot establish that the Wisconsin Court of Appeals' decision upholding the trial court's imposed sanction over other options involved an unreasonable application of *Trombetta* or *Youngblood*, particularly given that *Trombetta* anticipated the very type of sanction imposed in Chong's case—evidence suppression—even without the added benefit of permitting a defendant to present the suppressed evidence if believed it would benefit his case. *Trombetta*, 467 U.S. at 487.

In the end, even if this Court were to conclude that there existed a more appropriate remedy that the trial court could have imposed for the violation of Chong's due process rights, that still wouldn't mean that Chong is now entitled to federal habeas corpus relief because Chong has not met the difficult showing that the Wisconsin Court of Appeals decision affirming the sanction imposed in his case was not just wrong but "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *See Richter*, 562 U.S. at 103. Having failed to meet that burden, the district court was correct to deny federal habeas corpus relief, and this Court should affirm that decision.

## II.     The Wisconsin Court of Appeals did not unreasonably apply *Brady* when it rejected Lee's evidence suppression due process claim, which is not properly before this Court on appeal.

### A.     This Court should decline to review Chong's *Brady* claim for which neither the district court nor this Court issued a certificate of appealability.

"In accordance with 28 U.S.C. § 2253(c), a habeas petitioner may appeal only those issues for which a certificate of appealability has been granted." *Rittenhouse v. Battles*, 263 F.3d 689, 693 (7th Cir. 2001). "[T]o issue a certificate of appealability '[w]here a district court has rejected [a habeas petitioner's] constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Id.* (citation omitted).

Despite that requirement, this Court has "consider[ed] requests to amend a certificate of appealability even when they are presented in a petitioner's briefs to this court." *Ouska v. Cahill-Masching*, 246 F.3d 1036, 1046 (7th Cir. 2001). "A party can make such a request by specifically asking us to consider the issue in its brief or 'by simply including issues in its briefs that were not specified in the certificate.'" *Rittenhouse*, 263 F.3d at 693 (quoting *Ouska*, 246 F.3d at 1045).

This Court need not honor such a request, however, where the petitioner has failed to show that the additional issue he seeks to include in an amended

certificate of appealability meets the criteria for a certificate of appealability to be granted in the first place. *See id.* at 693–94. Here, Chong has made no such showing. That is, he has not shown that reasonable jurists would find the district court's assessment of his *Brady* claim to be either debatable or wrong. *Id.* at 693. Indeed, he does not even reference the district court's reasoning for rejecting his *Brady* claim, let alone defend any argument that its assessment was debatable or wrong. Rather, he simply raises his *Brady* claim as though the district court or this Court has issued a certificate of appealability on that issue, when neither court had done so.

Because Chong has neither secured a certificate of appealability from either court to permit appellate review of his *Brady* claim, and because he has not even argued—let alone established—that the district court's reasoning for rejecting that claim was debatable or wrong, this Court should decline to review his *Brady* claim.

### B. A criminal defendant's due process rights may be violated where the government withholds exculpatory evidence in its possession.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is

exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999).

To establish the prejudice under *Brady*, a defendant must prove that the suppressed evidence was material. *Id.* at 282. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). "[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281.

### C.   Fair-minded jurists could agree with the Wisconsin Court of Appeals that the 2013 interview evidence was not favorable to Chong because it was not exculpatory.

Chong argued in the state courts that the 2013 interview evidence was favorable to him because it was exculpatory. (Dkt. 26-3:17–21.) He insisted that the evidence was exculpatory for three reasons: (1) Ryan, Mikey, and Watou did not identify him as the shooter despite describing the shooter's "clothing, personal characteristics, and direction of travel"; (2) police arrested Paul for the homicide after the interviews, suggesting that the witnesses must

31

have said something signifying that he was the shooter; and (3) police would not have destroyed the evidence unless it was exculpatory. (Dkt. 26-3:17–21.)

The Wisconsin Court of Appeals disagreed, concluding that Chong failed to show that the 2013 interview evidence was exculpatory under *Brady*. (Additional App. 12–13.) Rejecting his first argument, the court observed that Chong failed to point to anything in the record suggesting that Ryan, Mikey, or Watou described the shooter in a way that "eliminated—or even cast doubt on—the possibility that Chong was the shooter." (Additional App. 12.) The court went on to explain why the failure by Ryan, Mikey, or Watou to identify Chong by name was not exculpatory since Watou and Ryan did not know Chong at the time and therefore would not have had a name to give, whereas the witness who knew Chong—Mikey—thought Chong was in jail when the shooting occurred, which surveillance footage proved to be false. (Additional App. 12.) Rejecting his second argument, the court held that "Chong's assertion that the interviews must have supported a theory that Paul was the shooter is pure speculation." (Additional App. 13.) And rejecting his third argument, the court held "that the recordings were destroyed does not compel a conclusion that they contained exculpatory evidence" given that "[m]ultiple police officers testified that the recordings were destroyed in order to protect the identities of the witnesses who expressed concerns about their safety," which "provided a

32

plausible alternative motive for the destruction of the recordings." (Additional App. 13.)

The district court was correct to reject Chong's *Brady* claim because he failed to establish that the Wisconsin Court of Appeals' analysis on that first prong was not just wrong but unreasonable. As the foregoing recitation reveals, the court considered each of Chong's arguments concerning his view of how the 2013 interview evidence was exculpatory, and it explained why each lacked merit. (Additional App. 12–13.) And although Chong may disagree with the court's assessment, his argument attacking the court's rationale focuses on the wrong prong of the *Brady* test.

To that end, while Chong recognizes that *Brady* requires a distinct showing of evidence favorability and materiality under the test's first and third prongs, his criticism of the Wisconsin Court of Appeals' analysis as to why the 2013 interview evidence was not exculpatory (a favorability analysis) involves no more than assertions about the impact that evidence would have had on his trial (a materiality analysis). (Chong's Br. 55–60.) In effect, Chong basically makes the same argument twice, explaining why the suppressed evidence was *material* and why he was prejudiced by its suppression *because the evidence was material*. (Chong's Br. 55–62.)

For example, he appears to renew his argument that the 2013 interview evidence was exculpatory because Watou, Mikey, and Ryan did not identify

him by name when describing the shooter to police, despite Mikey knowing Chong from their childhood and Watou and Ryan having some familiarity with the Lee family. (Chong's Br. 57.) Rather than explain how that evidence was exculpatory, however, he pivots to the Wisconsin Court of Appeals' materiality analysis after merely noting in a footnote that "[c]ourts have found evidence to be 'undeniably favorable' under *Brady* when an eyewitness . . . knew the defendant but failed to identify him." (Chong's Br. 57 (citing *McNeill v. Bagley*, 10 F.4th 588, 598 (6th Cir. 2021).)

Ignoring briefly Chong's improper conflating of two prongs of the *Brady* test, *McNeill* does not help Chong for at least two reasons. First, *McNeill* does not say what Chong says it does. *McNeill* proclaimed that a police report, which revealed that a murder witness who did not identify a known suspect during an initial photo lineup, was "undeniably favorable because it would provide *impeachment evidence* against" the same witness who later identified the suspect during a second photo lineup. *McNeill*, F.4th at 589–99 (emphasis added). *McNeill* drew no distinction between witnesses who knew a suspect before witnessing a crime; the Sixth Circuit merely noted the impeaching effect the evidence would have had if defense counsel could have used it to challenge the witness's credibility at trial. *Id.* Conversely, Chong insists only that the 2013 interview evidence is exculpatory; he does not argue that the evidence was impeaching, nor could he. When interviewed a second time, neither Ryan,

Mikey, nor Watou ever changed their stories such that they needed to be impeached. Secondly, even if *McNeill* did say what Chong says it did, that still wouldn't help Chong because his ability to obtain federal habeas relief rests on his ability to show that the Wisconsin Court of Appeals either decided contrary to or unreasonably applied Supreme Court precedent, and *McNeill* is not a Supreme Court decision.

Chong also criticizes the Wisconsin Court of Appeals for dismissing as speculative his theory that the 2013 interview evidence must have been exculpatory because police arrested Paul following those interviews, but he again wrongly focuses on the possible impact the evidence would have had at his trial rather than whether it was exculpatory. (Chong's Br. 59–60.) Again, the relevant question under *Brady*'s first prong is whether the evidence was favorable to Chong. *Strickler*, 527 U.S. at 281–82. Chong fails to develop any argument that it was, and he certainly does not explain why the Wisconsin Court of Appeals' decision dismissing that argument as speculative constituted an unreasonable application of *Brady*.

Moreover, as a practical matter, Chong's argument fails to answer the important question that the district court posed when it rejected his claim below: "[I]f the statements of Watou Lee, Mikey Thao, and Ryan Thao were exculpatory, why were they not called as a witness for the defense?" (Dkt. 44:11–12.) The answer is simple: Chong declined to call any of those three

witnesses to testify at his trial, including Mikey, because even *he* did not believe they had any exculpatory information that would help his defense. If he did, he would have called those men to testify at his trial, which did not occur until well after he learned of the men's identities, after police had interviewed them a second time, and after the defense had a chance to interview them. Simply put, Chong cannot have it both ways, faulting the Wisconsin Court of Appeals for concluding that the 2013 interview evidence was not exculpatory when his actions reveal that he, too, did not view the evidence as exculpatory.

In short, Chong could not prevail on his *Brady* claim without satisfying all three prongs of the *Brady* test, and he advances no developed argument that the Wisconsin Court of Appeals unreasonably applied *Brady* when it held that 2013 interview evidence was not exculpatory and therefore not favorable to him. Rather, he advances arguments concerning his view of the evidence's materiality, which is a separate prong of the *Brady* test. Because the district court correctly held that the 2013 interview evidence was not exculpatory, and because Chong fails to argue otherwise, this Court should affirm the denial of habeas corpus relief.

## D.     The State suppressed the 2013 interview evidence.

The State concedes that Chong met the second prong of the three-prong *Brady* test. That is, he established that the State failed to disclose the evidence

36

derived from the initial 2013 interviews of Ryan, Mikey, and Watou. Indeed, the State has not disputed that point; as Lee correctly points out, "[t]he State previously conceded that the Appleton Police Department suppressed the evidence of the initial interviews of Ryan Thao, Mikey Thao, and Watou Lee." (Chong's Br. 54.) However, as explained both above and below, that concession does not entitled Chong to relief: he still had to show that the suppressed evidence was both favorable and material, and he established neither.

### E.   Fair-minded jurists could agree with the Wisconsin Court of Appeals that Chong was not prejudiced by suppression of the 2013 interview evidence.

Chong argued in the state courts that the suppressed 2013 interview evidence was material under *Brady*. (Dkt. 26-3:17–21.) He asserted that the evidence was material because "[i]t is axiomatic that any evidence identifying someone other than Chong was the shooter would been favorable and material in determining whether the State proved beyond a reasonable doubt that Chong was the shooter," particularly in a case like Chong's, "where there was no physical evidence connecting Chong as the shooter, where no witnesses saw Chong shoot the victim, and where the State's case was based primarily on witnesses claiming Chong confessed." (Dkt. 26-3:19–20.)

The Wisconsin Court of Appeals disagreed, concluding that Chong failed to show that the 2013 interview evidence was material under *Brady*. (Additional App. 13–18.) In reaching that conclusion, the court cited two state

appellate decisions for legal principles governing its analysis, namely that "[e]vidence is material only if there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed to the defense," that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome of the case," that courts "may consider the effect that suppression might have had on the preparation or presentation of the defendant's case," and that "[s]trong evidence against a defendant can render suppressed evidence immaterial under *Brady*." (Additional App. 13–16 (first citing *State v. Harris*, 2004 WI 64, ¶¶ 14, 16, 272 Wis. 2d 80, 680 N.W.2d 737; and then citing *Wayerski*, 922 N.W.2d 468, ¶ 62).)

The court then went on to offer three reasons why it deemed the 2013 interview evidence immaterial under *Brady*: (1) the evidence did not exculpate Chong; (2) there was no evidence suggesting that the suppression of evidence altered Chong's trial strategy given that his trial counsel obtained copies of the three witnesses' statements nine months before trial and had a defense investigator interview Ryan, who purportedly gave a description of the shooter that excluded Chong; and (3) the State presented "strong evidence of Chong's guilt at trial," which included seven witnesses who claimed to have heard Chong confess to the shooting, as well as an officer who testified that Paul advised that Chong was the shooter. (Additional App. 14–16.)

38

The district court was correct to reject Chong's *Brady* claim because he failed to establish that the Wisconsin Court of Appeals' analysis on that third prong was not just wrong but unreasonable. As the court explained, "[t]he only conceivable exculpatory statement Chong has identified was Mikey Thao's statement that he thought Chong was in jail on the night of the shooting," but video evidence proved otherwise, "overrid[ing] any potential exculpatory value that Mikey Thao's statement may have had." (Dkt. 44:13.)

Chong disagrees, but his arguments are again unpersuasive. As noted above, he dedicates a significant portion of his *Brady* evidence favorability analysis to the issue of evidence materiality, criticizing the Wisconsin Court of Appeals for discounting the significance of two details: (1) that police arrested Paul for the homicide after interviewing Mikey, Watou, and Ryan; and (2) that neither Mikey, Watou, nor Ryan identified Chong as the shooter despite each man either personally knowing Chong from childhood or being acquainted with Chong's family. (Chong's Br. 57–58.) In his view, the court afforded too little weight to the impact that evidence would have on a jury and "failed to consider how the suppressed evidence of actual *eye-witnesses* would affect the State's case of confessional witnesses and no physical evidence tying Chong to this crime." (Chong's Br. 58.)

The problem with Chong's argument is that it grossly overestimates the value the suppressed evidence would have on a jury's verdict while wholly

discounting the significant weight of evidence revealing that he was present at the scene of the shooting when it occurred, fled the scene immediately after the shooting occurred, and confessed to not one but *eight* different people that he was the one responsible for the fatal shooting.

To be clear, that police arrested Paul after those interviews is not the source of great mystery Chong implies it is. When police arrested Paul, they knew from video surveillance and another witness interview that he was at the Luna Lounge when the shooting occurred, that he had tried to punch the victim seconds before the shooting, and that he fled the scene right after the shooting while holding what appeared to be a firearm. (Dkt. 26-25:82–83, 137–38.) As Detective Rabas explained, he met with Paul at his workplace because police had not yet spoken with him about the shooting despite it appearing as though he was present and armed with a gun. (Dkt. 26-25:82–83.) Conversely, nothing about Detective Rabas's testimony—or any evidence, for that matter—implied that police pursued or arrested Paul because of something Mikey, Watou, or Ryan said during the 2013 interviews. Moreover, that the jury found Chong guilty despite hearing evidence revealing that police initially arrested Paul upon suspicion that he was the shooter but later ruled him out only further undercuts Chong's speculative assertion about the impact the 2013 interview evidence would have had on the trial verdicts.

The failure of Mikey, Watou, and Ryan to identify him as the shooter is also not as noteworthy as Chong contends, either. Indeed, this was not a case where witnesses were shown a photo lineup containing Chong's picture and either did not identify him as the shooter or identified someone else. (Dkt. 26-12:50–52.) If that were the situation, one may reasonably suspect that a jury might have had its doubts about Chong's guilt, but that did not happen. Two of the witnesses did not know Chong at all and only knew of him. (Dkt. 26-12:50; 26-15:20–21.) They could not have identified Chong as the shooter by name even if they were willing to do so, and Chong has never offered anything to suggest that those two men offered a physical description of the shooter that would have ruled him out. And while Mikey purportedly told police that he had some familiarity with Chong because they went to school together, Detective Rabas explained that this was hardly a close relationship: at best, the two were mere acquaintances, and there was nothing to suggest that Mikey had seen Chong in the recent past or would have even recognized him had he gotten a good look at the shooter's face. (Dkt. 26-14:99.) Moreover, as far as Mikey was concerned, he believed that Chong was in jail at the time. (Dkt. 26-14:100.)

Even assuming that all three men were extremely familiar with Chong—which was not the case—their failure to identify Chong as the shooter would not have carried much weight given their apparent motives against naming Chong as the suspect. As Detective Rabas's testimony revealed, all three men

41

were extremely concerned for their safety and did not want to be identified. (Dkt. 26-12:44; 26-15:18–21, 27, 42.) Given that the men simply did not name Chong as the shooter, as opposed to one or more of the men naming someone *besides Chong* as the shooter, the jury could readily infer that the witnesses elected not to identify Chong because they did not want to jeopardize their lives, not because someone besides Chong was responsible for the shooting.

In short, neither the fact police arrested Paul after the 2013 interviews nor the failure of Mikey, Watou, or Ryan to name Chong as the shooter would have given the jury any reason to doubt Chong's guilt, and the Wisconsin Court of Appeals thus reasonably concluded that the suppressed evidence was not material because it did not exculpate Chong. (Additional App. 14.)

Chong next criticizes the Wisconsin Court of Appeals for considering the potential impact that the suppressed evidence had on his trial preparation, asserting that the Supreme Court has "cautioned against using trial preparation as the standard for materiality." (Chong's Br. 60.)

There are two problems with his argument. First, the Supreme Court did not declare that courts may not consider consequences to trial preparation when assessing materiality of suppressed evidence under *Brady*. Rather, the Court merely cautioned against "focus[ing] on the impact of the undisclosed evidence on the defendant's ability to prepare for trial, *rather than* the materiality of the evidence to the issue of guilt or innocence." *United States v.*

*Agurs*, 427 U.S. 97, 112 n.20 (1976) (emphasis added). Put another way, *Agurs* teaches that courts must not ignore the impact the suppressed evidence had on a finding of guilt or innocence just because the suppression of evidence did not otherwise impact trial preparation.

Second, the Wisconsin Court of Appeals did not do what *Agurs* cautioned against. Rather, it considered the impact the suppressed evidence would have had on a finding of guilt or innocence before assessing the impact of the suppressed evidence on trial preparation. (Additional App. 14.) It was that initial component of its materiality analysis where the court declared that the 2013 interview evidence "did not exculpate Chong" leading it to conclude that "it is not reasonably probable that the result of Chong's trial would have been different had the interviews been disclosed to the defense." (Additional App. 14.) Contrary to Chong's argument, the court assessed materiality precisely how the Supreme Court endorsed, considering the impact the suppressed evidence had *both* on a finding of guilt or innocence *and* trial preparation.

Finally, Chong concludes by faulting the Wisconsin Court of Appeals for considering the strength of the State's case against him when holding that the 2013 interview evidence was not material, stressing that the court "failed to consider how the suppressed evidence of actual *eyewitnesses* would affect the State's case of confessional witnesses and no physical evidence tying Chong to this crime." (Chong's Br. 58.) But the court did consider that; it simply was not

43

convinced that there was a reasonable probability of a different trial result if the jury, having heard testimony and other evidence establishing that Chong confessed to *eight different people*, would have also learned about the substance of the 2013 interviews with Watou, Ryan, and Mikey. (Additional App. 16.)

In sum, Chong had to do more than establish that the Wisconsin Court of Appeals erred when it rejected his *Brady* claim for failure to show that he was prejudiced by the suppressed 2013 interview evidence; he had to show that the state court's decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103. Because he has not made that difficult showing, and because the district court recognized the same, this Court should affirm the denial of habeas corpus relief.

### F. Chong's requested relief in connection with his due process evidence-suppression claim is illogical.

As a final point, the State would be remiss if it did not highlight one additional problem with Chong's argument: the relief he seeks of this Court is illogical. Specifically, he contends that he "should be granted a new trial because the State violated his due process rights under *Brady*." (Chong's Br. 53.) But a new trial would make no sense here. The State already turned over all the evidence that it could by the time of Chong's initial trial, and a second trial would serve no purpose as there is no additional evidence for the State to

turn over. That said, this Court need not assess the logic of his requested relief because he has not demonstrated that the Wisconsin Court of Appeals decided contrary to or unreasonably applied *Brady* in the first place.

## CONCLUSION

This Court should affirm the district court's order dismissing Lee's Petition and denying federal habeas relief.

Dated this 20th day of June 2025.

Respectfully submitted,

JOSHUA L. KAUL
Attorney General of Wisconsin

Electronically signed by:

s/ John W. Kellis*
JOHN W. KELLIS
Assistant Attorney General
State Bar #1083400

Attorneys for Respondent-Appellee

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-7081
(608) 294-2907 (Fax)
john.kellis@wisdoj.gov

*Counsel of Record*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), typeface requirements of Fed. R. App. P. 32(a)(5), and type style requirements of Fed. R. App. P. 32(a)(6).

This brief contains 10,775 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in 13-point Century Schoolbook.

Dated this 20th day of June 2025.

Electronically signed by:

s/ John W. Kellis
JOHN W. KELLIS

## CERTIFICATE OF SERVICE

I certify that on June 20, 2025, I electronically filed the foregoing Brief of Respondent-Appellee with the clerk of court using the CM/ECF system, which will accomplish electronic notice and service for all participants who are registered CM/ECF users.

I further certify that two copies of the above document were mailed to:

      CHRISTINE A. WALSH & SYDNEY DARNALL
      TAFT STETTINIUS & HOLLISTER LLP
      ONE INDIANA SQUARE, SUITE 3500
      INDIANAPOLIS, IN 46204

      BENJAMIN S. MORRELL
      TAFT STETTINIUS & HOLLISTER LLP
      111 EAST WACKER DRIVE, SUITE 2600
      CHICAGO, IL 60601

Dated this 20th day of June 2025.

                Electronically signed by:

                s/ John W. Kellis
                JOHN W. KELLIS