No. 24-2647

In the
# United States Court of Appeals
## for the Seventh Circuit

CHONG LEE,

*Petitioner-Appellant,*

v.

BRADLEY MLODZIK,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Eastern District of Wisconsin
No. 2:22-cv-00620-WCG

**REPLY BRIEF OF PETITIONER-APPELLANT**

Christine A. Walsh
Sydney Darnall
Taft Stettinius &
Hollister LLP
One Indiana Square
Suite 3500
Indianapolis, IN 46204
Tel.: (317) 713-3500
Fax: (317) 713-3699
cwalsh@taftlaw.com
sdarnall@taftlaw.com

Benjamin S. Morrell
Taft Stettinius &
Hollister LLP
111 East Wacker Drive
Suite 2600
Chicago, IL 60601
Tel.: (312) 527-4000
Fax: (312) 527-4011
bmorrell@taftlaw.com

*Appointed Counsel for Petitioner-Appellant*

# TABLE OF CONTENTS

Table of Contents ........................................................................i

Table of Authorities.................................................................. iii

Introduction................................................................................1

Argument....................................................................................3

I.   The State concedes that Chong's due process rights were
     violated under *Youngblood* and *Trombetta*. ....................................3

     A.   This Court has not yet decided whether Wisconsin's
          *Luedtke* tests are contrary to *Youngblood*
          and *Trombetta.* ........................................................4

     B.   The State has previously conceded that Wisconsin's
          *Luedtke* tests are contrary to *Youngblood* and *Trombetta.*.....5

II.  The Wisconsin Court of Appeals unreasonably applied
     *Youngblood* and *Trombetta* by affirming the trial court's
     remedy for the State's destruction of the witness interviews. ........6

     A.   *Trombetta* clearly contemplates courts using their
          discretion to ascertain the appropriate remedy. ...................6

     B.   The trial court's remedy was no remedy at all because
          it exposed Chong to further prejudice. .................................8

          1.   The State cannot protect witnesses by violating a
               defendant's due process rights.......................................8

          2.   The April 2015 interviews should not be considered
               substitute evidence. ....................................................9

          3.   Chong could not responsibly call the three witnesses
               to the stand without a reliable method to impeach
               them..........................................................................111

4.      Dismissal is the appropriate remedy, but to the extent that another remedy could cure the prejudice, Chong advocates for that remedy alternatively. ............5

III.   The district court and this Court issued a certificate of appealability for a *Brady* violation, and the State violated Chong's due process rights under *Brady*. .....................................15

A.      The district court issued a certificate of appealability reaching a *Brady* analysis, and this Court's order confirms it............................................................................15

B.      The State violated Chong's due process rights under *Brady* when it suppressed the three witness interviews. ...166

1.      The interviews must have been favorable because police went out and arrested Paul Lee, not Chong Lee, right after the interviews concluded..................177

2.      Chong was prejudiced by the suppression of the witness interviews.......................................19

Conclusion ..........................................................................200

Certificate of Compliance....................................................222

Certificate of Service ..........................................................233

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Youngblood,*
    488 U.S. 51 (1988) ...................................................................... *passim*

*Armstrong v. Daily,*
    786 F.3d 529 (7th Cir. 2015) .............................................. 8, 10, 11, 16

*Brady v. Maryland,*
    373 U.S. 83 (1963) ...................................................................... *passim*

*California v. Trombetta,*
    467 U.S. 479 (1984) .................................................................... *passim*

*Cook v. Cook,*
    560 N.W.2d 246 (1997) .......................................................................... 6

*United States ex rel. Hampton v. Leibach,*
    347 F.3d 219 (7th Cir. 2003) .............................................................. 18

*McCarthy v. Pollard,*
    656 F.3d 478 (7th Cir., 2011) ...................................................... 4, 5, 8

*Mendoza v. Miller,*
    779 F.2d 1287 (7th Cir., 1985) ............................................................ 9

*Nichols v. Wiersma,*
    108 F.4th 545 (7th Cir. 2024) ......................................................... 4, 5

*State v. Chong Leng Lee,*
    No. 2018AP1741-CR, 2019 WL 6869589 (Wis. Ct. App.
    Dec. 17, 2019) ....................................................................................... 6

*State v. Luedtke,*
    863 N.W.2d 592 (Wis. 2015) ....................................................... 4, 5, 6

*United States v. Agurs,*
    427 U.S. 97 (1976) ............................................................................. 18

*United States v. Bagley,*
  473 U.S. 667 (1985)......................................................................... 17, 19

*United States v. Napue,*
  834 F.2d 1311 (7th Cir., 1987)............................................................. 9

**Statutes**

28 U.S.C. § 2254 ................................................................................... 7

**Rules**

Fed. R. Crim. P. 16 ............................................................................... 9

## INTRODUCTION

The State concedes that Chong's claims "that police withheld and later destroyed recordings of witness interviews conducted as part of a homicide investigation sounds egregious." (State's Br. at 12.) Yet it contends that this Court is "not tasked with deciding whether there were better ways for police to protect three witnesses who asked not to be identified." (*Id.*) That is incorrect. The State cannot sidestep constitutional obligations simply because a witness prefers anonymity. The State never sought to designate these eyewitnesses as confidential informants, nor did it pursue any constitutionally sound procedure to balance witness protection with Chong's due process rights. Instead, the State intentionally failed to disclose their existence to Chong. Then the State destroyed all evidence of what these eyewitnesses said that caused police to immediately arrest a different suspect: Chong's brother, Paul.

The State admits that destroying the recordings of these witness interviews violated Chong's due process rights under *Youngblood* and *Trombetta*. This concession is significant; counsel could locate no other case in either this Circuit or the Supreme Court where a defendant proved a constitutional violation under *Youngblood* and *Trombetta*. The only remaining question is whether the trial court's remedy adequately addressed that violation. It did not. In fact, it compounded the prejudice against Chong.

By calling these witnesses, the trial court had ruled that Chong could

open the door to further statements from them. This placed Chong in an untenable position. If he called the three witnesses and they testified in line with their contrived 2015 re-interviews conducted by Appleton police, Chong could neither refresh their recollections nor impeach them because the officers had destroyed the original 2013 recordings. And calling them risked opening the door to prejudicial testimony that Chong had no way to counteract. Faced with this dilemma, Chong declined to call the witnesses, because the court's "remedy" offered no meaningful relief and would have left him worse off.

The State attempts to downplay the lack of impeachment evidence, arguing that "Chong could impeach them with their prior statements by calling as witnesses the officers or detectives who previously interviewed them to inform the jury that the men were either lying at trial or lying during their previous statements." (State's Br. at 26.) But this underscores the inadequacy of the trial court's remedy. It would force Chong to rely on the self-serving recollections of Sergeant Thao—the very officer who destroyed the recordings in bad faith—to impeach other State witnesses. That is no remedy at all.

A "remedy" that requires a defendant to rely solely on the testimony of the officer responsible for the constitutional violation cannot satisfy *Youngblood* and *Trombetta* (at least, not on these facts). Chong therefore requests dismissal, or alternatively, some remedy that genuinely cures the prejudice caused by the State's misconduct.

2

## ARGUMENT

### I.    The State concedes that Chong's due process rights were violated under *Youngblood* and *Trombetta*.

Everyone agrees about one key aspect of this case: the State's bad faith destruction of the recordings of witness interviews violated Chong's due process rights. As the State itself conceded: "The Wisconsin Court of Appeals agreed that [Chong's due process rights were violated], (Additional App. 24), and the State has not argued otherwise in this federal habeas corpus action." (State's Br. at 21.) While reaching the same conclusion, Chong and the State disagree about the applicable test that gets them there.

Chong's opening brief explains how this Court interprets *Youngblood* and *Trombetta* differently from the Wisconsin Supreme Court. This Court has held that *Youngblood* and *Trombetta* create one test for courts to determine whether the destruction of potentially exculpatory evidence violates a defendant's right to due process: "(1) the State acted in bad faith; (2) the exculpatory value of the evidence was apparent before it was destroyed; and (3) the evidence was of such a nature that the petitioner was unable to obtain comparable evidence by other reasonably available means." *McCarthy v. Pollard*, 656 F.3d 478, 485 (7th Cir., 2011). But as even the State acknowledges, the Wisconsin Court of Appeals interpreted *Youngblood* and *Trombetta* to create two distinct tests: "(1) [The State] fails to preserve

evidence that is apparently exculpatory or (2) [The State] acts in bad faith by failing to preserve evidence that is potentially exculpatory." *State v. Luedtke*, 863 N.W.2d 592 (Wis. 2015). Chong submits that the *Luedtke* tests are contrary to *Youngblood* and *Trombetta.*

### A. This Court has not yet decided whether Wisconsin's *Luedtke* tests are contrary to *Youngblood* and *Trombetta.*

The State attempts to refute Chong's argument by citing a single case from this Court: *Nichols v. Wiersma*, 108 F.4th 545 (7th Cir. 2024). The State reads *Nichols* as definitively deciding that the *Luedtke* tests are not contrary to clearly established federal law. The State is wrong.

As Chong argued in his opening brief, this Court has yet to decide whether the *Luedtke* test comports with clearly established federal law. In *Nichols*, the Court cited its previous decisions calling it a "dubious" proposition whether AEDPA's "unreasonable application" prong requires this Court to accept the *Luedtke* tests. *See McCarthy*, 656 F.3d at 485. After this Court acknowledged that Supreme Court of the United States decisions are the "ultimate touchstone," and that different interpretations do not automatically merit lower federal courts granting habeas relief, the very next sentence begins with, "Regardless of which rule applies . . ." *Nichols*, 108 F.4th at 554. The Court goes on to explain why the Wisconsin Court of Appeals rightfully concluded that Nichols does not satisfy either of the tests contemplated—the

federal test comprised of *Youngblood* and *Trombetta*, or the *Luedtke* tests. So *Nichols* never answered whether the *Luedtke* tests comport with clearly established federal law because it was unnecessary. Nichols failed a prong of both *Luedtke* tests and a prong of this Court's test.

### B. The State has previously conceded that Wisconsin's *Luedtke* tests are contrary to *Youngblood* and *Trombetta*.

Throughout this litigation, the State has changed its mind on whether the Wisconsin courts correctly interpreted and applied *Youngblood* and *Trombetta*. In the State's brief in this Court, it argues Chong is not entitled to relief "simply because the Wisconsin Court of Appeals continues to interpret *Trombetta* and *Youngblood* differently than this Court." (State's Br. at 20.) But in its 2019 Wisconsin Court of Appeals response brief, the State stated the opposite:

> As an initial matter, the due process test from cases like ***Luedtke*** **is based on a misinterpretation of the relevant Supreme Court precedent, *Trombetta* and *Youngblood*** . . . Contrary to Wisconsin case law, "*Trombetta* and *Youngblood* do not create two separate rules, with the former governing 'apparently' exculpatory evidence and the latter governing 'potentially' exculpatory evidence." *Id.* at 484–85.

Resp. Br. of Pl.-Respondent at 17–18, *State v. Chong Leng Lee*, No. 2018AP1741-CR (Wis. Ct. App. Dec. 17, 2019) (emphasis added). The Wisconsin Court of Appeals acknowledged this but ultimately concluded that it was "bound by the Wisconsin Supreme Court's decision in *Luedtke*." *Chong Leng*

*Lee*, 2019 WL 6869589, at *8 n.8. *See Cook v. Cook*, 560 N.W.2d 246 (1997).

* * *

There is no disagreement; the State's bad faith destruction of the recordings of witness interviews violated Chong's due process rights. The State, at times, has also agreed with Chong that the *Luedtke* tests are "based on a misinterpretation of the relevant Supreme Court precedent, *Trombetta* and *Youngblood*."

## II. The Wisconsin Court of Appeals unreasonably applied *Youngblood* and *Trombetta* by affirming the trial court's remedy for the State's destruction of the witness interviews.

Because the State concedes Chong's due process rights were violated under *Youngblood* and *Trombetta*, the crux of this case is now whether the Wisconsin Court of Appeals' remedy to cure Sergeant Thao's destruction of the witness interviews "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," which in this matter, is *Youngblood* and *Trombetta*. 28 U.S.C. § 2254(d)(1).

### A. *Trombetta* clearly contemplates courts using their discretion to ascertain the appropriate remedy.

Contrary to the State's characterization, Chong does not argue that *Youngblood* and *Trombetta* mandate dismissal of charges in *all* cases where the State destroys evidence and violates a defendant's due process rights. Instead, Chong argues in this case for dismissal or another remedy that cures

the prejudice the State caused by intentionally destroying this evidence.

The Supreme Court has explained that "[i]n nondisclosure cases, a court can grant the defendant a new trial at which the previously suppressed evidence may be introduced." *Trombetta*, 467 U.S. at 486–87. "But when evidence has been destroyed in violation of the Constitution, the court must choose between barring further prosecution or suppressing . . . the State's most probative evidence." *Id.* The State argues that "neither *Youngblood* nor *Trombetta* really offer meaningful guidance—much less a specific rule—on how to fashion a remedy for an evidence-destruction due process violation." (State's Br. at 21–22.) From this premise, the State argues that the trial court's decision could not have violated clearly established federal law.

To be sure, *Trombetta* explains why fashioning a remedy is troubling for courts—it is difficult to develop doctrine about permanently lost evidence. Doing so requires courts to "divin[e] the import of materials whose contents are unknown and, very often, disputed." *Trombetta*, 467 U.S. at 486–87. Still, one principle from *Trombetta* is obvious: the remedy must actually be a remedy—not something that exposes the defendant to further prejudice. *See Armstrong v. Daily*, 786 F.3d 529, 552 (7th Cir. 2015). Because the state court failed to provide Chong a remedy affording him "a meaningful opportunity to present a complete defense," he is entitled to relief under *Youngblood* and *Trombetta*. *McCarthy v. Pollard*, 656 F.3d 478, 483 (7th Cir. 2011).

7

**B.     The trial court's remedy was no remedy at all because it exposed Chong to further prejudice.**

The State works hard to justify the trial court's decision to suppress evidence, rather than dismiss Chong's charges. Specifically, the State argues the Wisconsin Court of Appeals properly considered "mitigating factors." (State's Br. at 7, 10, 22.) But the State fails to recognize that what it calls mitigating factors were actually aggravating factors. Under these circumstances, dismissal was the proper remedy—a remedy that was well within the trial court's discretion under *Youngblood* and *Trombetta*.

**1.     The State cannot protect witnesses by violating a defendant's due process rights.**

The State claims it was trying to protect the witnesses who claimed concern for their safety. But the State does not have a blank check to violate Chong's constitutional rights simply because the witnesses did not want to get involved. If the State truly had "grave concerns" for witness safety, there were many options it could have pursued that could have simultaneously protected witnesses and Chong's constitutional rights. (*See* State's Br. at 12.)

The State never sought protection for these witnesses from the trial court. *See United States v. Napue*, 834 F.2d 1311, 1317 (7th Cir. 1987) (analyzing courts' discretion to deny discovery of witness information otherwise permitted under Fed. R. Crim. P. 16(d) "where there is reason to believe that a witness would be subject to physical or economic harm if his identity is

revealed."). Most notably, the State never sought to protect these witnesses as confidential informants. *See, e.g.*, *Mendoza v. Miller*, 779 F.2d 1287, 1293 (7th Cir. 1985) (discussing balancing confidential informant's protections against inmate's interest in a fair hearing). Indeed, despite its claimed "grave concerns," it produced a photo with their names on it and then fully disclosed the witnesses' information. (*See* State's Br. at 12.) The State then requested to re-interview the witnesses in 2015 so that the State could give Chong something after the inadvertent disclosure. The witnesses agreed to be re-interviewed, apparently no longer concerned for their safety. The State wanted to give Chong the witnesses' information and 2015 re-interviews so he would not discover the existence of their initial interviews in 2013 that immediately led to Paul's arrest.

The State's actions belie a legitimate concern for these witnesses' safety in this matter. Instead, they show that the primary concern was with what these witnesses said to the officers in 2013.

### 2. The April 2015 interviews should not be considered substitute evidence.

One of the mitigating factors that the State suggests warranted suppression instead of dismissal is "that police reinterviewed the witnesses before Chong's trial and provided recordings to the defense." (State's Br. at 23.) Substitute evidence has at times been permitted by this Court as an adequate

remedy, such as *Armstrong*'s summary report capturing the original notes. 786 F.3d at 549. But Armstrong's substitute evidence (the summary report) was created concurrently with the destroyed evidence (the original notes) as means of "transferring the data thereon." *See id.* at 549.

Unlike Armstrong's summary report, the State conducted the April 2015 interviews only *because of* the State's inadvertent disclosure of the 2013 witness interviews. The April 2015 interviews were not contemporaneous evidence capturing the same data—they were an attempt at a cover-up two years later. The State has no response to Chong's argument that the only reason the April 2015 interviews exist is because the State wanted *something* to turn over when Chong inevitably asked about the witnesses following the inadvertent disclosure of their identities.

Motives for creating them aside, the 2015 interviews took place more than 15 months after the original 2013 interviews. Memories fade with time, and details become confused. And we know that the witnesses said *something* in those 2013 interviews that caused police to seek out and arrest Paul Lee— not Chong Lee. This is the key exculpatory fact in the case. Yet a reader of the 2015 interview transcripts would have no clue what that *something* was. The reason is simple: transcripts of the 2015 interviews conducted as part of an attempted cover-up were not true substitutes of evidence of the interviews of those witnesses in 2013—interviews that led police to go arrest Paul the very

same day.

### 3.   Chong could not responsibly call the three witnesses to the stand without a reliable method to impeach them.

Another alleged mitigating factor that the State suggests warranted evidence suppression instead of dismissal is that Chong could have called the witnesses to testify at trial. (State's Br. at 26.) The State argues that Chong could have called the three witnesses at trial because the trial court "did not suggest that calling Watou, Mikey, or Ryan as witnesses would open the door to anything," and instead simply said that "attempts to argue that police had engaged in misconduct would allow the State to present evidence about why the officers destroyed the 2013 interview evidence." (State's Br. at 25.)

The trial court was not so clear. This is the trial court's initial ruling. (*See* Additional App. 32.) But just moments later, the trial court, realizing on its own that the ruling was unclear, further muddled the suppression ruling:

> THE COURT: Okay. And then it would be -- I suppose, just hopefully I made it clear, I don't know if the defense was anticipating calling the three witnesses that I've identified as being suppressed. Understand that if they get called, that may potentially open the door for further questioning of those witnesses. I think I did hopefully make that clear that, you know, if officers are inquired about the destruction of the evidence or alternatively those witnesses get called, that may reopen the door potentially.

> ATTORNEY WEITZ: And I guess, my only thought is, certainly I think that the defense should be allowed to ask the officers questions about the missing recordings. Would that by itself -- is

that what the court is saying?

THE COURT: Well, here's the problem, because, by way of example, if the argument is going to be Appleton police destroyed these evidence -- this evidence, which the inference is going to be we want the jury to believe they did something improper, then that will open the door to allow the police department to say -- and I only mention this because I think Sergeant Rabas has testified to this already, the reason I did this is because these witnesses were afraid and they didn't want that information released. So even though it may have -- even though -- and I've already given my decision, even though I conclude that that was not appropriate given precedent, they may be allowed to explain the reason for doing so, and dependent upon what is asked or what happens, that may potentially open the door to question Mikey or Watou, and I know there is one other person I'm missing. So it's -- it's hard for me to anticipate what will open that door, but just understand that potential questioning of the officers may allow them to explain why they did what they did, and if then to rebut that you decide to call those witnesses, that may reopen whole issue. I just want you to understand that - I don't mean this in a lighthearted way - there is no free lunch. I mean, everything is a give and take.

ATTORNEY WEITZ: And that certainly makes a lot more sense now the way that you've explained it. I was under the initial impression that it would just open the door automatically to every single statement from those witnesses coming in, but I certainly see that if there is questions about the destruction that they should be afforded the opportunity to explain the reasons for it but not bring in then all the underlying statements made by those witnesses, if I understand the court correctly.

THE COURT: That's correct. But if, by way of example, those three witnesses get called in to explain or to rebut, then that may open the door because now you have those witnesses on the stand.

ATTORNEY SCHNEIDER: Would the court be of the same thought -- this is just one other thing I'm thinking of -- is if defense, I'm going to say, opens the door, makes argument or statements that there were these other people in the front area that law enforcement didn't talk to, and they -- they attacked the police in that way, shape or form, then I would be at least allowed to have

12

the court reconsider or make the argument they've opened the door and we can then talk about the statements from those three parties?

THE COURT: I think you could at least -- and what we would do is similar as what we've discussed, request a side bar and we could potentially -- so I would at least entertain it. And again, it's too speculative for me to give a definitive answer one way or the other, but I'm always willing to listen to the arguments as proffered. But at this point in time, like I said, the State would not be able to, in its case in chief, call in those three witnesses, but that could be revisited depending upon how the case proceeds and what questions get asked.

(*Id.* at 35–38.)

The trial court explicitly said calling the three witnesses could open the door to further statements from those witnesses. So the trial court's remedy put Chong in a predicament. He could call the three witnesses whose 2013 interviews apparently caused police to arrest Paul. But if they testified consistently with their 2015 re-interviews contrived by Appleton police officers, Chong could neither refresh their recollections nor impeach them because those same officers destroyed the evidence of the 2013 interviews.

What's more, calling them risked opening the door to prejudicial testimony that they feared—further questioning of the witnesses by the State or further explanation from the officers. Putting Chong in that position provided no meaningful remedy for the *Youngblood* and *Trombetta* due process violations. Indeed, Chong opted not to call the three witnesses under those circumstances precisely because the state court's "remedy" was no remedy at

13

all. Availing himself of it would have made him worse off, not better off.

The State attempts to downplay the lack of impeachment evidence, arguing that "Chong could impeach them with their prior statements by calling as witnesses the officers or detectives who previously interviewed them to inform the jury that the men were either lying at trial or lying during their previous statements." (State's Br. at 26.) But that argument does not work for two reasons. First, how was Chong to divine a change in the witnesses' stories when he did not have access to the destroyed transcripts? Sergeant Thao's own self-serving recollection on the witness stand during pre-trial proceedings cannot be considered a full and accurate record of the interviews that he intentionally destroyed in bad faith.

Second, the State suggests that Chong should have called Sergeant Thao—both a State witness testifying against him and the very officer who intentionally destroyed the witness interviews in bad faith—to impeach the three witnesses. Even putting aside all of that, Sergeant Thao was hardly a reliable impeachment witnesses. He had a close relationship with the three witnesses and their families—so close that he was apparently willing to violate department policy and Chong's constitutional rights to protect them.

> **4. Dismissal is the appropriate remedy, but to the extent that another remedy could cure the prejudice, Chong advocates for that remedy alternatively.**

As discussed above, dismissal is the appropriate remedy because, in the

circumstances of this case, the trial court's evidence suppression "remedy" in fact resulted in further prejudice to Chong. It effectively prevented Chong from calling the witnesses without opening the door to all of their statements. However, this Court has additional options between affirming and finding that dismissal is the *only* appropriate remedy. Vacatur and remand to the district court to consider in the first instance what other remedy or remedies could cure the prejudice is one. Finding that another remedy would suffice (e.g., an adverse inference instruction as contemplated in Chong's opening brief) is another. What the facts of this case make abundantly clear is that the remedy selected by the trial court was woefully inadequate. Chong is entitled to a remedy of some kind that cures, and does not further perpetuate, the prejudice he has suffered.

**III.   The district court and this Court issued a certificate of appealability for a *Brady* violation, and the State violated Chong's due process rights under *Brady*.**

**A.   The district court issued a certificate of appealability reaching a *Brady* analysis, and this Court's order confirms it.**

The State tries to avoid a *Brady* analysis altogether, arguing that neither the district court nor this Court certified a *Brady* issue for briefing. (State's Br. at 29.) The record tells a different story. The district court combined its analysis of Chong's due process claims under both *Brady* and *Youngblood*. (Short App. at 8–9.) This Court described the issues certified for appeal as

whether "the State violated [Chong's] due process rights when government officials first failed to disclose, and then later intentionally destroyed, recording of three preliminary interviews with witnesses." (Dkt. 3 at 1.) This Court's mention of disclosure clearly implicates a *Brady* analysis along with a *Youngblood* analysis because "the critical question under *Brady* is whether the exculpatory evidence is 'disclosed in time for the defendant to make use of it.'" *Armstrong*, 786 F.3d at 552 (quoting *United States v. Grintjes*, 237 F.3d 876, 880 (7th Cir. 2001)). Thus, the *Brady* claim is a part of this appeal.

### B. The State violated Chong's due process rights under *Brady* when it suppressed the three witness interviews.

Chong is also entitled to relief because the State violated his due process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). The State failed to disclose that evidence to Chong for over a year, during which time it destroyed all evidence of those interviews, including the maps they drew of where the shooter came from in the Luna Lounge. (R. 26-13 at 52; R. 26-15 at 43.) The State has conceded (as it must) that it suppressed this evidence, one of the three elements of a *Brady* violation. (State's Br. at 36–37.) As to the remaining two elements, Chong has shown that the interviews must have been favorable to him, and the State's suppression of this evidence prejudiced him. *Id.*

1.    **The interviews must have been favorable because police went out and arrested Paul Lee, not Chong Lee, right after the interviews concluded.**

Importantly, the standard of favorability is whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985) (citation omitted). As explained in detail in Chong's opening brief, all three witnesses either knew Chong or knew who he was when Sergeant Thao interviewed them in 2013. Yet, immediately after Sergeant Thao conducted the interviews, police went out and arrested Paul Lee, not Chong Lee. This chain of events and short time period between the three witness interviews and Paul's arrest establish at least "a reasonable probability" that, had the interviews been preserved and disclosed before or during trial, the result of the proceeding would have been different. *Cf. id.* at 682. After all, *something* in those interviews apparently caused police to zero in on Paul Lee.

In a case relying on eyewitness testimony and no physical evidence, "one cannot summarily discount the possibility that the outcome of the trial might have been different had the jury heard credible testimony from other eyewitnesses." *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 256 (7th Cir. 2003). The Wisconsin Court of Appeals failed to consider how the suppressed evidence of actual *eyewitnesses* would affect the State's case of confessional

witnesses and no physical evidence tying Chong to this crime. The State was unable to recover the murder weapon or DNA evidence. And "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *United States v. Agurs*, 427 U.S. 97, 113 (1976).

The State fixates on Chong allegedly "fail[ing] to develop any argument that the [evidence was favorable], and . . . not explain[ing] why the Wisconsin Court of Appeals' decision dismissing that argument as speculative constituted an unreasonable application of *Brady*." (State's Br. at 35.) In typical *Brady* cases, evidence is withheld and then disclosed before trial, so the parties are provided a complete record to assess the previously withheld evidence's favorability. Of course, Chong isn't so fortunate. He cannot state for certain what the 2013 interviews established because Sergeant Thao didn't just fail to disclose them. He failed to disclose them, and then he destroyed them.

The State faults Chong for not being able to divine what Sergeant Thao destroyed. But *Bagley* does not require certainty. It requires only a "reasonable probability." And the actions of the Appleton Police Department confirm the police's conclusion immediately after those interviews that they had probable cause to arrest someone else for the murder provides that "reasonable probability." The State's contrary position would incentivize law enforcement officers who violate *Brady* by suppressing evidence to make sure they violate

18

*Youngblood* and *Trombetta* too by destroying it. If an inference like the one arising from Appleton's arrest of Paul Lee here is too indefinite to establish a "reasonable probability," destroying the evidence will serve to insulate officers from virtually all *Brady* claims.

The State also argues that Chong himself must not have thought the witnesses had any favorable evidence because he did not call them at trial. But as discussed above, calling those witnesses would put Chong in an impossible situation. On the one hand, he would have no chance to refresh their recollections or impeach them should they testify consistent with their 2015 interviews, instead of whatever they told police that led to Paul Lee's arrest in 2013. On the other hand, calling them risked opening the door to other prejudicial evidence that the state court had previously excluded. Far from suggesting that Chong did not believe the 2013 interview transcripts were favorable, his trial decision simply reflected the state court's prejudicial "remedy" for Sergeant Thao's *Youngblood* violation.

## 2. Chong was prejudiced by the suppression of the witness interviews.

Chong was deprived of an opportunity to show the jury what the three witnesses said in 2013 that caused police to believe they had probable cause to arrest Paul Lee instead of Chong Lee. By any measure, that establishes prejudice. By the time Chong learned of the suppressed witness interviews,

they had been destroyed forever.

## CONCLUSION

For the reasons discussed above and in Chong's opening brief, the Court should reverse the district court's judgment and remand with instructions to issue an order granting the writ of habeas corpus unless the State of Wisconsin provides Chong with a new sentencing hearing within 180 days. Alternatively, the Court should vacate the district court's judgment and remand with instructions to consider in the first instance what remedy would cure the prejudice Chong suffered as a result of the State's violation of his due process rights under *Youngblood* and *Trombetta*.

Filed: September 10, 2025.         Respectfully submitted,

CHONG LEE,
*By Counsel*

By   /s/ *Benjamin S. Morrell*
Christine A. Walsh
Sydney Darnall
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, IN 46204
Tel.: (317) 713-3500
Fax: (317) 713-3699
cwalsh@taftlaw.com
sdarnall@taftlaw.com

Benjamin S. Morrell
TAFT STETTINIUS & HOLLISTER LLP

111 East Wacker Drive, Suite 2600
Chicago, IL 60601
Tel.: (312) 527-4000
Fax: (312) 527-4011
bmorrell@taftlaw.com

*Appointed Counsel for Petitioner-*
*Appellant*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) and Cir. R. 32(c), because this document contains 4,849 words, excluding portions exempted by Federal Rule of Appellate Procedure 32(f).

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and Cir. R. 32(b) because this document has been prepared in a proportionally-spaced typeface in 13-point Century Schoolbook.

Date: September 10, 2025

*/s/ Benjamin S. Morrell*

## CERTIFICATE OF SERVICE

I certify that I caused this brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit on the date listed below using the CM/ECF system, thereby effecting service on counsel of record who are registered for electronic filing under Cir. R. 25(a).

Date: September 10, 2025

*/s/ Benjamin S. Morrell*